In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2097

CONSOLIDATION COAL COMPANY,

*Petitioner*,

*v.*

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,

*Respondent*.

Petition for Review of an Order of the
Benefits Review Board.
No. 17-BLA-0351.

ARGUED NOVEMBER 29, 2018 — DECIDED DECEMBER 21, 2018

Before FLAUM, RIPPLE, and MANION, *Circuit Judges*.

FLAUM, *Circuit Judge*. Ralph Ross worked as a coal miner for approximately thirty years. He smoked cigarettes for almost as long but was able to quit after his first heart attack. Ross continued to work as a coal miner even though he suffered another heart attack and had difficulty breathing at work. Approximately six years after Ross stopped working in the coal mines, his breathing problems became severe.

On January 19, 2012, Ross filed a claim for benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.* At first, the administrative law judge ("ALJ") denied Ross's claim. Ross petitioned the United States Department of Labor's Benefits Review Board (the "Board") for review, and the Board vacated and remanded the ALJ's decision for further consideration. On remand, the ALJ granted Ross's claim. Ross's former employer, petitioner Consolidation Coal Company (the "Employer"), petitioned the Board for review, and the Board affirmed the ALJ's subsequent decision. Then the Employer filed this appeal. We enforce the decision of the Board.

## I. Background

### A. Statutory and Regulatory Framework

Congress passed the Black Lung Benefits Act (the "Act") in light of the "significant number" of coal miners who became "totally disabled" from working in coal mines. 30 U.S.C. § 901(a). Under the Act, coal miners may receive modest monetary and medical benefits to treat their pulmonary impairments. *See id.* To establish eligibility for such benefits, a coal miner must show: (1) he has pneumoconiosis, (2) the pneumoconiosis arose out of coal mine employment, (3) he is totally disabled, and (4) the pneumoconiosis contributes to the total disability. 20 C.F.R. § 725.202(d).

The Act and its implementing regulations define pneumoconiosis as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b); 20 C.F.R. § 718.201(a). And the regulations define two subcategories of pneumoconiosis: "Clinical pneumoconiosis" refers to "those diseases recognized by the medical community as

pneumoconioses, i.e., the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment." 20 C.F.R. § 718.201(a)(1). "Legal pneumoconiosis" refers to "any chronic lung disease or impairment and its sequelae arising out of coal mine employment. This definition includes, but is not limited to, any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." *Id.* § 718.201(a)(2).

To establish a respiratory or pulmonary impairment that is "totally disabl[ing]" and qualifies him for benefits under the Act, a miner must show that the impairment prevents him from performing his usual coal mine work and from engaging in gainful employment that requires similar skills to his coal mining job and that is near his home. *Id.* § 718.204(b)(1)(i)–(ii). Additionally, the coal miner must satisfy certain medical criteria. *Id.* § 718.204(b)(2). "In absence of contrary probative evidence," evidence that meets any of the standards outlined in § 718.204(b)(2)(i)–(iv) "shall establish a miner's total disability." *Id.* Under subparagraph (i), pulmonary function tests "showing values equal to or less than those listed in [certain tables in] Appendix B to this part for … the $FEV_1$ test" qualify "if, in addition, such tests also reveal the values … equal to or less than those listed in … Appendix B for this part, for … the FVC test, or … the MVV test, or … [a] percentage of 55 or less when the results of the $FEV_1$ test are divided by the results of the FVC test ($FEV_1$/FVC equal to or less than 55%)." Under subparagraph (ii), arterial blood gas tests that "show the values listed in Appendix C to this part" qualify. Under subparagraph (iii), medical evidence showing the miner suffers from

"cor pulmonale with right-sided congestive heart failure"
qualifies. And subparagraph (iv) provides:

> Where total disability cannot be shown under
> paragraphs (b)(2)(i), (ii), or (iii) of this section, or
> where pulmonary function tests and/or blood
> gas studies are medically contraindicated, total
> disability may nevertheless be found if a physi-
> cian exercising reasoned medical judgment,
> based on medically acceptable clinical and la-
> boratory diagnostic techniques, concludes that
> a miner's respiratory or pulmonary condition
> prevents or prevented the miner from engaging
> in employment as described in paragraph (b)(1)
> of this section.

Congress intended for the Act to serve a remedial purpose
and for doubts "[i]n the absence of definitive medical conclu-
sion[s]" to be resolved in the miner's favor. S. Rep. No. 92-743,
at 2315. Accordingly, the Act includes a rebuttable presump-
tion that a miner may invoke if the miner can establish that he
has spent at least fifteen years working in a coal mine and es-
tablish pursuant to § 718.204 that he suffers from a totally dis-
abling respiratory or pulmonary impairment.[1] *See* 30 U.S.C.
§ 921(c)(4); 20 C.F.R. § 718.305. If the miner can make that
showing, the miner is presumed to be totally disabled by

---

[1] Congress originally added the fifteen-year presumption in 1972, *see*
Pub. L. No. 92–303, § 4(c) (1972); but in 1981, Congress limited its applica-
bility to claims filed before January 1, 1982, *see* Pub. L. No. 97–119,
§ 202(b)(1) (1981). Then, in 2010, Congress made the fifteen-year presump-
tion available for claims filed after January 1, 2005 that were still pending
on or after March 23, 2010. *See Keene v. Consolidation Coal Co.*, 645 F.3d 844,
847 (7th Cir. 2011).

pneumoconiosis. 20 C.F.R. § 718.305(c)(1). The miner's employer may rebut that presumption either by disproving the existence of legal and clinical pneumoconiosis, or by ruling out pneumoconiosis as a partial cause of the miner's disability. *Id.* § 718.305(d)(1).

### B. Factual Background

Ross spent thirteen years working underground in the mine and at least seventeen years working on the surface of the mine. Throughout his career, the dust from the mine was inescapable. After a day's work, his clothes were "too nasty" to take inside his home, so he would shower at work, change into different clothes, and leave his work clothes hanging in his garage. Cleaning his work clothes required using the laundromat's special washer for coal miner's clothes, and even then, it took two wash cycles to remove the dust and grease from the coal mine.

Starting at the age of twenty and for approximately the next thirty years, Ross smoked between one-half to two packs of cigarettes per day, though sometimes he would begin smoking a cigarette, but would be too busy with work to finish it, so he'd extinguish it and go back to work. He quit smoking in 1989 after suffering his first heart attack. Unfortunately, Ross had another serious heart attack in 1995, and he suspects he had a third heart attack in 1998.

Ross had breathing problems while working in the coal mines. He struggled to carry his tools while climbing the stairs and he often had to take breaks to catch his breath. And yet, Ross kept working. That is, he kept working until his employer "let [him] go" in 2000 because he "got blinded in the right eye." At that time, Ross said he felt he could still do his

job from a cardiac standpoint and that from a pulmonary standpoint, he "was trying." Since his coal mining career ended, Ross has not held steady employment. To stay busy, Ross volunteered by cutting firewood with a chainsaw, mowing lawns with a riding lawnmower, and putting up hay with a square baler.

Ross said his breathing problems became severe in 2006 or 2007. He has testified that since that time, he cannot walk around his house and yard like he used to, and it takes him longer to complete daily tasks, namely feeding his animals and mowing the lawn. Although he takes medication for his breathing problems, he can only perform fifteen to twenty minutes of work before he has to sit down to take a break for thirty-five to forty minutes. Ross uses an oxygen monitor to make sure his oxygen does not fall so low as to risk stroke or death. When his oxygen levels get too low, Ross uses supplemental oxygen.

## C. Procedural Background

### 1. The ALJ's First Decision

On January 19, 2012, Ross filed a claim for benefits under the Act. The District Director awarded Ross benefits in October 2012; the Employer requested a hearing before the Office of Administrative Law Judges. In preparation for that hearing, the Director of the Office of Workers' Compensation Programs in the United States Department of Labor (the "Director"), Ross, and the Employer gathered medical evidence to present to the ALJ. The hearing occurred on October 23, 2013; Ross and his wife both testified. After the hearing, Ross and

the Employer submitted briefs and the ALJ issued a decision denying benefits on September 8, 2014.

The ALJ determined that Ross had over fifteen years of qualifying coal mine employment, and in turn, focused on whether Ross was entitled to invoke the fifteen-year presumption by establishing a totally disabling respiratory or pulmonary impairment using qualifying medical evidence. Beginning with the pulmonary function tests, the ALJ noted that the parties submitted three such exams for Ross. Dr. Tazbaz, on behalf of the Department of Labor, performed the first exam on Ross on February 13, 2012, and that exam produced qualifying values prebronchodilator. Dr. Tuteur, on behalf of the Employer, performed two more exams on Ross on June 28, 2012, and those exams produced nonqualifying values prebronchodilator and postbronchodilator. Since the ALJ found the more recent results to be the best indicator of Ross's pulmonary condition, the ALJ concluded that the pulmonary function testing, standing alone, did not support a finding of total disability under 20 C.F.R. § 718.204(b)(2)(i).

Then, the ALJ discussed the blood gas studies: Ross underwent four such studies, two at rest and two after exercise. In both "after exercise" studies, Ross's $PCO_2$ increased and his $PO_2$ decreased, thereby producing qualifying values. The ALJ noted that Dr. Tazbaz concluded that these studies showed that Ross had a "pulmonary limitation to exercise with hypoxemia that requires oxygen," and that Dr. Tuteur indicated that the "after exercise" qualifying result was abnormal, but a reflection of a development of oxygen gas exchange impairment after exercise. The ALJ found that the blood gas studies, standing alone, supported a finding of total disability under § 718.204(b)(2)(ii).

Next, the ALJ briefly noted that there was no evidence that Ross had cor pulmonale with right-sided congestive heart failure, so total disability could not be supported on that basis. *See id.* § 718.204(b)(2)(iii).

Finally, the ALJ considered the medical opinion evidence of three doctors. First, Dr. Tazbaz opined that Ross was "severely impaired with desaturation on exercise test" and "cannot do his activities in last year of employment." He diagnosed Ross with chronic obstructive pulmonary disease, coal workers' pneumoconiosis, coronary artery disease, and hypoxemia with exercise. He opined that the cause of these conditions was exposure to coal mine dust and cigarette smoke. Second, Dr. Tuteur indicated that Ross had a "minimal obstructive abnormality and some air trapping," but he opined that this was "not clinically meaningful and … is [in] no way associated with any disability or reduced function." Dr. Tuteur explained that Ross's hypoxemia and blood gas results were "most likely … due to a right to left intracardiac shunt unrelated to the inhalation of coal mine dust, but consistent with complications of the coronary artery disease, myocardial infarctions, surgical treatment and their sequelae."[2] And Dr. Tuteur opined that there was no evidence to support legal or clinical coal workers' pneumoconiosis or any coal-mine-dust-related pulmonary process. Finally, Dr. Selby reviewed Ross's medical records and submitted a report of his findings. In that report, dated March 18, 2013, Dr. Selby opined that Ross was

---

[2] The ALJ also noted that Dr. Tuteur testified at a deposition that even when Ross received 100% oxygen during an exam, Ross's hypoxemia was not corrected, which Dr. Tuteur interpreted as an indication that: (1) Ross's blood never gets to his lungs because it is shunted away, and (2) the cause of Ross's hypoxemia was not a pulmonary condition.

not totally disabled from a pulmonary or respiratory stand-
point. Dr. Selby also testified at a deposition on September 10,
2013: In his opinion, Ross's minor pulmonary impairment
was due to his extensive cigarette smoking and prior history
of histoplasmosis or tuberculosis. He explained that Ross's
post-exercise levels demonstrated serious hypoxia, which
"might cause some limitation." But Dr. Selby testified that the
cause of Ross's drop in oxygen was not pulmonary in nature
because his pulmonary function tests were normal, which "is
virtually 100 percent predictive of no lung disease." He testi-
fied that the evidence is "exactly to the contrary" of a finding
of total disability due to a pulmonary condition.

The ALJ summarized the medical opinion evidence, in rel-
evant part, as follows:

> All three physicians are board-certified in pul-
> monary and internal medicine, and only one
> physician, Dr. Tazbaz, opined that [Ross] was
> totally disabled from a pulmonary standpoint.
> Dr. Tuteur opined that [Ross] was totally disa-
> bled from a cardiac standpoint, and Dr. Selby
> did not find that [Ross] was totally disabled at
> all. With regard to the issue of total disability,
> Drs. Selby and Tuteur's opinions were well rea-
> soned, documented, and supported by the total-
> ity of the medical evidence. Dr. Tazbaz's very
> minimal opinion did not consider [Ross's] other
> testing and medical evidence, or [Ross's] severe
> cardiac issues as … potential causes of his im-
> pairment. Greater weight may be accorded an
> opinion supported by more extensive documen-
> tation over an opinion supported by limited

> medical data…. Accordingly, I find Dr. Tazbaz's opinion is entitled to less weight and it is not sufficiently documented. A doctor's opinion that is both reasoned and documented and is supported by objective medical tests and consistent with all the documentation in the record, is entitled to greater probative weight…. Therefore, based on the abovementioned discussion, I find that the medical opinion evidence, standing alone, does not support a finding of total disability. [*See id.* § 718.204(b)(2)(iv).]

Then, the ALJ considered all the probative evidence and found that the preponderance of the evidence did not establish that Ross had a totally disabling respiratory or pulmonary impairment. As a result, the ALJ concluded that Ross was not entitled to invoke the fifteen-year presumption. Ultimately, the ALJ denied Ross's claim for benefits.[3]

### 2. *The First Petition for Review*

Ross petitioned the Board to review the ALJ's decision. The Director filed a response, asking the Board to vacate the denial of benefits and to remand the case for further consideration. The Employer also filed a response, and it moved to strike the Director's brief as violating 20 C.F.R. § 802.212(b), which limits the Board's consideration of arguments in response briefs to those that respond to arguments raised in the

---

[3] The ALJ also found that Ross did not establish the existence of complicated pneumoconiosis such that he would be entitled to invoke the irrebuttable presumption under 30 U.S.C. § 921(c)(3) and 20 C.F.R. § 718.304(a). Those findings are not at issue on appeal.

petitioner's brief or that support the decision below; the Board denied the motion.

As for the merits of the appeal, the Board determined that the ALJ erred in several ways: combining the analysis of total disability and disability causation, which are meant to be distinct inquiries; characterizing Dr. Tazbaz's opinion as not considering Ross's severe cardiac issues as potential causes of the impairment when in fact Dr. Tazbaz considered Ross's aortic valve replacement and triple bypass surgery, questioned the congestive heart failure diagnosis, performed an electrocardiogram that produced normal sinus rhythm, and diagnosed Ross with coronary artery disease; considering Dr. Tazbaz's opinion to not be "sufficiently documented" when Dr. Tazbaz relied on results from a physical examination, chest x-ray, pulmonary function study, blood gas study, echocardiogram (ECG), and Ross's smoking, work, and surgery histories; and not explaining why Drs. Tuteur's and Selby's opinions were better supported, especially in light of the fact that Ross's treatment records did not show a shunt despite extensive cardiac testing, Dr. Tuteur did not include the complete results of Ross's blood gas study conducted with 100% oxygen, and neither doctor conducted an ECG. Due to these errors, the Board vacated the ALJ's findings that Ross did not establish total disability under 20 C.F.R. § 718.204(b)(2)(iv), that the totality of the evidence did not establish total disability under § 718.204(b)(2), and that Ross did not invoke the fifteen-year presumption under 30 U.S.C. § 921(c)(4). As such, the Board remanded the case to the ALJ for further consideration of the relevant evidence.

The Employer moved for reconsideration of the Board's decision, arguing that the Board erred in denying the motion

to strike the Director's brief and that the Board exceeded its scope of review by engaging in a de novo review of the case, improperly adopting the Director's position, and usurping the ALJ's fact-finding authority. The Board denied the Employer's motion.

### 3. The ALJ's Second Decision

Back before the ALJ, the Employer moved for leave to submit supplemental medical opinions. The ALJ granted that motion and it admitted the Employer's submission of supplemental medical opinions from Drs. Tuteur and Selby. After further briefing, Ross submitted Dr. Tazbaz's supplemental opinion and additional treatment records, and the Employer submitted second supplemental opinions by Drs. Tuteur and Selby. The ALJ issued its second decision on March 7, 2017. The ALJ incorporated the findings from his first decision under 20 C.F.R. § 718.204(b)(iv), and then outlined, in detail, the supplemental medical opinion evidence.

In Dr. Tuteur's March 18, 2016 supplemental opinion, he included the complete results of the blood gas study that was conducted on June 28, 2012, on which Dr. Tuteur heavily relied in reaching his first opinion that a right-to-left shunt caused Ross's hypoxemia. In this specific exam, Ross received 100% oxygen and still experienced hypoxemia. In the supplemental opinion, Dr. Tuteur found that it was unequivocally clear that Ross was totally and permanently disabled from engaging in work as a coal miner and that the disability is due to the demonstrated pathophysiology where Ross becomes hypoxemic with exercise. But Dr. Tuteur confirmed that the physiologic presence of a right-to-left shunt was well-documented in the pulmonary function test he performed on Ross in 2012. He acknowledged that performing a bubble study at

the time of an echocardiogram is a less sensitive method of confirming the presence of a right-to-left shunt, and that this test was not done. Nevertheless, Dr. Tuteur still concluded with reasonable medical certainty that because Ross has advanced chronic coronary artery disease and very mild chronic obstructive pulmonary disease, the exercise-induced oxygen desaturation was a result of a right-to-left shunt. He emphasized that Ross does not have a meaningful impairment of ventilatory function, nor does he have a meaningful impairment of oxygen gas exchange due to a primary pulmonary process. He also stated that the cardiac disease is in no way related to, aggravated by, or caused by inhalation of coal mine dust or the development of coal workers' pneumoconiosis.

Dr. Selby submitted his supplemental opinion on May 13, 2016. He explained that the 100% oxygen test Dr. Tuteur performed showed incontrovertible proof of the presence of a shunt and that the decreased $PO_2$ was not due to lung disease. Citing a New England Journal of Medicine article from 1984 describing the use of diffusing capacity as a predictor of arterial oxygen desaturation during exercise in patients with chronic obstructive pulmonary disease, Dr. Selby explained that the study showed that if a patient had a diffusion capacity above 55% of predicted, virtually 100% of the time the exercise blood gases would show no desaturation of oxygen. He noted that Ross had a normal diffusion capacity when corrected for alveolar volume, but that even the obtained raw value was further support that the oxygen drop could not be caused by pulmonary disease and that another source must be the cause. Finally, Dr. Selby disagreed with Dr. Tuteur's diagnosis of a minimal obstructive ventilatory defect. He reiterated his earlier opinion that Ross's condition is not a total

and permanent disability, and that Ross does not have clinical or legal pneumoconiosis.

Dr. Tazbaz based his August 3, 2016 supplemental opinion on his first opinion and a review of additional medical opinions and treatment records. He observed that x-rays and a CT scan from 2012 established pneumoconiosis radiologically. Dr. Tazbaz diagnosed Ross with clinical pneumoconiosis caused by inhalation of coal mine dust, chronic obstructive pulmonary disease caused by coal mine dust and cigarette smoking, and total disability due to pneumoconiosis and chronic obstructive pulmonary disease. He further opined that Ross's obesity and aging added to his disability. Regarding the study Dr. Selby cited, Dr. Tazbaz observed that the study did not address the subset of patients who had combined chronic obstructive pulmonary disease, coal workers' pneumoconiosis, obesity, and aging as risk factors for oxygen desaturation, and that those patients (including Ross) are more likely to desaturate with all of those factors combined. Next, Dr. Tazbaz noted that Ross's stress test from August 2, 2013 did not show cardiac ischemia, which would mean that the bypass from Ross's coronary artery bypass graft surgery was functioning well, and that the oxygen desaturation could not be attributed to heart disease. Similarly, an echocardiogram performed on February 1, 2012 showed normal heart function and therefore, Ross did not have heart failure. Based on this medical evidence, Dr. Tazbaz opined that Ross's heart disease had been treated surgically and was not causing any major issues from a cardiac standpoint. And Dr. Tazbaz maintained that the test of choice to determine the presence of a shunt is an echocardiogram with a bubble study, which was not done here.

After reviewing Dr. Tazbaz's supplemental opinion and the results of the stress test and echocardiogram, Dr. Tuteur submitted a second supplemental opinion. He confirmed that his previous opinion was unchanged, and he added that there was no meaningful obstructive ventilatory abnormality, meaning that there was no chronic obstructive pulmonary disease. He again confirmed that the echocardiogram did not use a bubble study to determine whether a shunt was present; he noted that the echocardiogram "did demonstrate low normal left ventricular ejection fraction," but that no comment was made regarding an assessment of diastolic dysfunction, which is "a particularly important factor especially in the face of sub-optimally controlled hypertension." He also remarked that "[n]o comment was made on the state of function of the aortic valve replacement." Finally, Dr. Tuteur refuted Dr. Tazbaz's conclusion that Ross has clinical pneumoconiosis, explaining that the x-rays were mostly negative and that the diagnosis was unconfirmed by CT scan. He also disagreed with Dr. Tazbaz's diagnosis of legal pneumoconiosis because he concluded there was clinically no meaningful airflow obstruction by pulmonary function testing.

Dr. Selby also submitted a second supplemental opinion after reviewing the stress test, the echocardiogram, Dr. Tazbaz's supplemental opinion, and Dr. Tuteur's second supplemental opinion. Dr. Selby agreed with Dr. Tazbaz that there was no significant reversibility in Ross's FEV₁/FVC ratio, but Dr. Selby stated that the normal ratio indicates that there is no permanent obstruction. Dr. Selby also agreed with Dr. Tazbaz that the article and study he cited did not separate all possible comorbidities like coal workers' pneumoconiosis or obesity. But, he stated that obesity does not directly affect diffusion

capacity and that aging is already adjusted for in the pre-dicted values. Notwithstanding the absence of a bubble study, Dr. Selby defended his opinion that a shunt could be the only cause of exercise hypoxia when there is no congestive heart failure. In the end, he still concluded that Ross did not have coal workers' pneumoconiosis and that Ross's exercise was not significantly limited by pulmonary disease.

Based on the further developed record of medical opinion evidence, the ALJ concluded that Dr. Tazbaz's opinion was "well-documented" and "supported by the underlying objective tests and various work, smoking and medical histories." Next, the ALJ found that "Dr. Tuteur now opines that [Ross] suffers from a totally disabling impairment which is respiratory or pulmonary in nature and this conclusion is supported by his interpretation of the blood gas study values on exercise."[4] Finally, the ALJ faulted Dr. Selby for not discussing the significance of the exercise blood gas studies that yielded qualifying results, and for not addressing whether Ross is

---

[4] Comparing the plain language of Dr. Tuteur's supplemental opinions and this part of the ALJ's decision might suggest tension—Dr. Tuteur makes clear he thinks the cause of Ross's total and permanent disability is a cardiac impairment (the shunt), not a respiratory or pulmonary impairment. However, relying on the results of the exams Dr. Tuteur performed on Ross and Dr. Tuteur's observation that those exams produced qualifying results constitute substantial evidence to support the ALJ's finding here. *See Midland Coal Co. v. Dir., Office of Workers' Comp. Programs*, 358 F.3d 486, 493 (7th Cir. 2004) (to decide if total disability has been established, "an ALJ must consider all relevant evidence on the issue of disability including medical opinions which are phrased in terms of total disability or provide a medical assessment of physical abilities or exertional limitations which lead to that conclusion" (quoting *Poole v. Freeman United Coal Mining Co.*, 897 F.2d 888, 894 (7th Cir. 1990))).

able to perform his usual coal mine work despite the qualifying blood gas results. As such, the ALJ found Dr. Selby's opinions not well-reasoned and the ALJ accorded them "little weight."

The ALJ decided that the better-reasoned opinions on total disability were those of Drs. Tazbaz and Tuteur. And the ALJ found that the preponderance of the medical opinions established total disability under 20 C.F.R. § 718.204(b)(2)(iv). Next, the ALJ considered all the evidence and found that the preponderance of the evidence established that Ross suffers from a totally disabling pulmonary impairment and cannot return to his previous coal mine employment. *Id.* § 718.204(b)(1). Because the parties did not dispute that Ross satisfied the requisite number of years of coal mine employment, the ALJ then concluded that Ross established conditions sufficient to invoke the rebuttable presumption of total disability due to pneumoconiosis under 30 U.S.C. § 921(c)(4) and 20 C.F.R. § 718.305.

As for rebutting the presumption, the ALJ explained that the only medical opinion evidence that could support the Employer's attempt to disprove the existence of legal pneumoconiosis were those of Drs. Tuteur and Selby. However: the ALJ found Dr. Tuteur's statements about Ross's obstructive impairments inconsistent; the ALJ faulted Dr. Tuteur for not addressing how he eliminated Ross's significant coal dust exposure and attributed the impairment to Ross's smoking history exclusively; and the ALJ took issue with Dr. Tuteur's conclusion that Ross did not have chronic obstructive pulmonary disease despite the several years of treatment records diagnosing Ross with that disease and a CT scan interpretation by

a board-certified B-reader diagnosing Ross with mild to moderate centrilobular emphysema. Similarly, the ALJ found that Dr. Selby's opinion did not adequately consider Ross's medical and treatment records regarding chronic obstructive pulmonary disease and emphysema, nor did it sufficiently address Ross's approximately thirty-year exposure to coal dust. And the ALJ noted that Dr. Selby's view that Ross's decrease in oxygen was not pulmonary because pulmonary function tests are "virtually 100 percent predictive of no lung disease" was contrary to the Act's implementing regulations that permit miners to establish a totally disabling respiratory impairment by blood gas studies. Finally, the ALJ credited Dr. Tazbaz's qualification of the utility of Dr. Selby's citation to the diffusing capacity study as it did not consider all of Ross's comorbidities.

Since the ALJ accorded the two relevant medical opinions little weight, he concluded that there was insufficient evidence to disprove the presumed existence of legal pneumoconiosis. And because the Employer cannot rebut the presumption of clinical pneumoconiosis without rebutting the presumption of legal pneumoconiosis, the ALJ reasoned that he "need not" decide whether the Employer rebutted the existence of clinical pneumoconiosis. *See* 30 U.S.C. § 921(c)(4); 20 C.F.R. § 718.305(d)(1)(i). Similarly, because the ALJ held "there [wa]s no reasoned medical opinion or other competent evidence excluding pneumoconiosis as a causative factor in [Ross]'s total disability," the Employer also could not meet its burden of proving that pneumoconiosis played no part in Ross's disability. 20 C.F.R. § 718.305(d)(1)(ii). Therefore, the ALJ decided Ross was entitled to benefits under the Act.

### 4. *The Second Petition for Review*

The Employer petitioned the Board to review the ALJ's second decision. Renewing its argument from its motion for reconsideration, the Employer argued that the Board exceeded its scope of review by accepting the Director's arguments and vacating the ALJ's initial decision on that basis. The Employer also asserted that the Board directed the ALJ to find on remand that Ross is totally disabled, in violation of the Administrative Procedures Act ("APA") and due process. The Employer also took issue with the ALJ's weighing of the medical opinion evidence on the issue of total disability, arguing this led to an erroneous finding that Ross invoked the fifteen-year presumption. Lastly, the Employer argued that the ALJ erred in finding that it could not rebut the presumption.

The Board "decline[d] to consider" the Employer's argument that the Board exceeded its scope of review because the Board had considered and rejected the same argument in the Employer's motion for reconsideration. Additionally, the Board dismissed the Employer's argument that the Board directed the ALJ to make certain findings on remand because the plain language of the Board's opinion stated that the ALJ should reconsider relevant evidence. And given that the Employer had an opportunity to submit supplemental opinions from Drs. Selby and Tuteur, as well as to file briefs to advocate for its position, the Board found no basis for the Employer's assertion that the Board had violated the Employer's due process rights.

The Board determined that the ALJ's crediting of Dr. Tazbaz's opinion, discrediting of Dr. Selby's opinion, and finding that Dr. Tuteur diagnosed Ross with a totally disabling pulmonary condition was supported by the evidence. The Board

affirmed the ALJ's finding that the preponderance of the medical evidence established total disability under 20 C.F.R. § 718.204(b)(2)(iv), that weighing the evidence established total disability under § 718.204(b)(2), and that Ross invoked the presumption under 30 U.S.C. § 921(c)(4). And because only Drs. Tuteur's and Selby's opinions that the shunt caused Ross's impairment provided rebuttal evidence, and the ALJ did not find those opinions to be sufficiently reasoned or documented, the Board held that the ALJ permissibly discredited those opinions and rationally concluded that the Employer did not carry its burden of disproving the establishment of legal pneumoconiosis or that pneumoconiosis caused, to some extent, Ross's respiratory or pulmonary total disability.

The Employer filed this appeal, seeking to strike the Director's response brief and to reinstate the ALJ's first decision denying Ross benefits under the Act.

## II. Discussion

On a petition for review from a decision by the Board, we look at the ALJ's decision and consider the entire record, but we do not reassess the facts or substitute our judgment for that of the ALJ. *Dalton v. Office of Workers' Comp. Programs*, 738 F.3d 779, 783 (7th Cir. 2013) (citing *Amax Coal Co. v. Beasley*, 957 F.2d 324, 327 (7th Cir. 1992)). Our review of the Board's decision is limited to whether the Board exceeded its scope of review and whether it committed an error of law. *Id.* (citing *Old Ben Coal Co. v. Prewitt*, 755 F.2d 588, 590 (7th Cir. 1985)). The Board's scope of review is statutorily defined: the Board must affirm an ALJ's decision if it is rational, supported by

substantial evidence, and in accordance with applicable law. *Id.* (citing 33 U.S.C. § 921(b)(3); 20 C.F.R. § 802.301).

### A. The Director's Response Brief

The Employer maintains that the Board should have granted its motion to strike the Director's response brief because 20 C.F.R. § 802.212(b) provides that the Board may not consider arguments in response briefs unless the arguments respond to issues raised in the petitioner's brief or support the decision below, and the Director's response brief contained arguments that Ross had not raised in his petition for review from the Board and that the parties had not presented to the ALJ. Additionally, the Employer argues that the Board violated the APA and due process by considering the Director's brief on the basis that the brief responded to "general allegations of error" in Ross's petition for review.

According to the Employer, the Director's brief criticized the ALJ's analysis of the medical opinion evidence "in great detail," while Ross's brief only argued that because the opinions of Drs. Tuteur and Selby "fail[ed] to recognize the uncontradicted [blood gas] testing results as evidence of pulmonary disability," the ALJ erred in finding those opinions to be well-rationalized. The Employer insists that the only area of "agreement" between Ross's brief and the Director's brief is their shared reliance on *Bounds v. Marfork Coal Company*, BRB No. 13-0522, 2014 WL 3897749 (Ben. Rev. Bd. July 29, 2014) ("*Bounds II*"). Even then, the Employer argues that Ross and the Director relied on *Bounds II* for different propositions.

Ross admits that the Director's response brief was "more artfully stated" than his brief, but he does not concede that the

Director advanced new arguments, in violation of the regulation. Similarly, the Director claims it addressed "more fully" the same arguments Ross made in his brief. The Director further defends its brief by noting that there is no statutory or regulatory rule that the response brief may only parrot an opening brief. To the contrary, in *Harris v. Todd Pacific Shipyards Corp.*, the Board interpreted "response" to include arguments in agreement with the opening brief. 28 BRBS 254, 1994 WL 661158, at *3 n.4 (Ben. Rev. Bd. Oct. 25, 1994) (per curiam) (citing 20 C.F.R. § 802.212(b)).[5]

In his petition to the Board, Ross challenged the ALJ's decision that the medical evidence was insufficient to show a totally disabling pulmonary condition. Ross criticized the ALJ's jump from acknowledging that Dr. Tazbaz concluded that Ross had a "pulmonary limitation to exercise with hypoxemia that requires oxygen" and that two blood gas tests produced qualifying results, to nevertheless concluding that the preponderance of the evidence established that Ross was not totally disabled on a pulmonary basis. To make that jump, Ross

---

[5] In its reply brief, the Employer argues that *Harris* is "contrary to the regulation." We disagree. *Harris*'s application of the regulation was well-reasoned. The Board in *Harris* denied the employers' motions to strike because "[c]ontrary to employers' contentions, a party may 'respond' to the petitioner's brief by agreeing with the arguments made therein, as the Director has done in the instant cases." 1994 WL 661158, at *3 n.4. Section 802.212(b) does not define "response," and there is nothing in the regulation or in the plain meaning of the term "response" to suggest that a response cannot take the form of an agreement, as *Harris* held. Additionally, there is no indication of how similar or different a "response" must be from the previous assertion or question, so there is support for the notion that the Director could file a brief agreeing with the arguments in the petitioner's brief either by merely reiterating those arguments or by recasting those arguments in a new light.

insisted, the ALJ must have credited Dr. Selby's statement that "[Ross's] drop in [oxygen] was not pulmonary in nature." This was error "as a matter of black lung law" and well-settled Board precedent, Ross contended, citing *Bounds II* for the proposition that the Board had previously rejected a similar argument that blood gas studies were cardiac-related and not pulmonary in nature.

In *Bounds II*, the miner's claim for benefits was before the Board for a second time. 2014 WL 3897749, at *1. On remand, the ALJ had found that the pulmonary function study evidence did not establish total respiratory disability, but that the blood gas study and the medical opinion evidence did; because the ALJ determined that the employer did not rebut the presumption, the ALJ awarded the miner benefits. *Id.* at *2. On appeal, the employer challenged the ALJ's total disability finding by asserting that the blood gas study evidence was insufficient to establish total respiratory disability because the results reflected a hypertensive cardiovascular response to exercise, not a total respiratory impairment. *Id.* at *4. After noting that the ALJ based his total disability conclusion on the blood gas study evidence, and that the employer's experts did not dispute that the blood gas studies revealed a disabling condition, only that the blood gas studies revealed a pulmonary condition (because they believed the studies revealed a cardiac disease), the Board rejected the employer's argument that the blood gas study evidence was insufficient to establish a totally disabling respiratory impairment. *Id.*

The Director's brief, in relevant part, cited *Bounds II* after stating that "the Director agrees with [Ross]'s assertion that the ALJ erred by conflating the issue of total disability with the issue of cause of disability when determining whether the

evidence was sufficient to establish invocation of the [30 U.S.C. § 921](c)(4) presumption." The brief further states: "As [Ross] notes, the Board has recognized that a physician's statement that qualifying [blood gas] results are due to non-pulmonary causes is not relevant to the disability inquiry.… Instead, any such opinions should be addressed when evaluating the cause of disability." The Director maintained that the ALJ's error was not harmless because the ALJ did not "critically analyze the medical opinion evidence in finding no disability," which means that even if the presumption was invoked, the Board had no basis to conclude that the ALJ's credibility findings would support a finding that the Employer could rebut that presumption.

What distinguishes Ross's brief from the Director's is that the Director characterized the ALJ's errors in this case and in *Bounds II* as a conflation of two distinct inquiries. Ross did not use that language, but when Ross included a block quotation from *Bounds II* in his petition for review that explained the Board's reason for rejecting that employer's challenge to the sufficiency of the miner's qualifying blood gas studies, Ross was making the same point as the Director: the cause of qualifying blood gas results is not relevant to the ALJ's inquiry into whether the miner has a totally disabling pulmonary condition, it is only relevant to the ALJ's inquiry into disability causation. Neither this distinction nor the differing levels of quality or detail between the two briefs are enough to remove the Director's brief from the realm of a "response" under the regulations. 20 C.F.R. § 802.212(b); *see Harris*, 1994 WL 661158, at *3 n.4.

Finally, we are not persuaded by the Employer's argument that the Board's denial of the motion to strike violated

the APA and due process. In reaching its conclusion on the motion to strike, the Board reasoned that because Ross challenged the ALJ's weighing of medical opinion evidence and finding that he did not have a totally disabling pulmonary impairment, the Board could consider the arguments in the Director's brief that responded to those "general allegations of error on that issue." The Board cited 20 C.F.R. § 802.212(b) and *Barnes v. Director*, *Office of Workers' Compensation Programs*, BRB No. 93-0584, 1995 WL 80211 (Ben. Rev. Bd. Feb. 15, 1995) (en banc) to support its reasoning. The Employer interprets *Barnes* as providing the Director with standing to argue any issue it believes the ALJ decided erroneously so long as a party appeals the ALJ's decision and alleges the ALJ erred in declining to award benefits. As such, the Employer contends that *Barnes* undermines the APA and due process.[6]

However, this case does not raise the concerns the Employer has about *Barnes*. Sitting *en banc*, the Board in *Barnes* decided that it could consider arguments from the Director's brief because they "respond[ed] to claimant's general allegation that the [ALJ] erred in failing to award benefits." 1995 WL 80211, at *2. Notably, the Board had previously held that the claimant did not raise any arguments about the ALJ's decision with sufficient specificity to invoke the Board's review, and therefore, the Board refused to consider the Director's brief as

---

[6] The Employer's argument concerning an APA violation is undeveloped; the Employer does not identify which provision of the APA it believes was violated. As such, this argument is waived. *See Shumaker v. Colvin*, 632 F. App'x. 861, 867 (7th Cir. 2015) (undeveloped arguments on appeal are waived). We will consider the Employer's related, and more developed, argument that the Board violated due process by denying the motion to strike.

nonresponsive. *Id.* Unlike the claimant in *Barnes*, however, Ross raised several specific issues in his petition for review and the Director's response brief only expounded on those points. This was all in keeping with 20 C.F.R. § 802.212(b).

Moreover, there was no due process violation because, as Ross and the Director point out, the Employer had the opportunity to argue its case twice before the ALJ and twice before the Board, including the chance to submit supplemental medical opinion evidence. Thus, we enforce the Board's denial of the Employer's motion to strike the Director's response brief.

### B.  The ALJ's First Decision

The Employer challenges the Board's decision to vacate the ALJ's first decision and to remand the claim. Specifically, the Employer argues that the Board blindly adopted the Director's legal arguments and factual findings, and that the Board forced the ALJ to do the same on remand. As such, the Employer argues that the Board exceeded its scope of review and that its decision was contrary to law.

Returning to the portion of the Director's brief that argues the ALJ erred by conflating two distinct inquiries, the Employer now seeks to undermine this argument as relying on conflicting Board precedent. As we discussed above, the Director cited *Bounds II* to support its point that the total disability inquiry is distinct from the disability causation inquiry. But *Bounds II* was not the only decision the Director cited for that proposition; the Director also cited *Street v. Dominion Coal Corp.*, BRB No. 13-0116, 2013 WL 6408512 (Ben. Rev. Bd. Nov. 27, 2013) (per curiam) ("*Street II*"). The Employer incorrectly argues that *Bounds II* reached a contrary result to *Street II*. Fo-

cusing on a different part of the *Bounds II* decision, the Employer now argues that the Board in *Bounds II* affirmed the ALJ's consideration of the cause of the impairment before the invocation of the fifteen-year presumption. This misstates the relevant holding of *Bounds II*.

The employer in *Bounds II* argued that the ALJ relieved the miner of the burden of establishing a totally disabling respiratory impairment because the ALJ focused on the cause of the claimant's impairment. 2014 WL 3897749, at *5. But as the Board explained, it was the doctors who "premised their diagnoses regarding a pulmonary impairment on their determinations of the cause of claimant's hypoxia." *Id.* Because the ALJ permissibly found one doctor more qualified than the others and credited that doctor's opinion over the others, the Board rejected the employer's argument that the ALJ improperly combined his analysis of the issues of total disability and disability causation. *Id.*

Read that way, *Bounds II* does not conflict with *Street II*. In *Street II*, the ALJ decided that one doctor's opinion that the claimant "did not retain the respiratory capacity to perform his regular coal mine employment" was sufficient to establish total respiratory disability because the blood gas study results supported this opinion. 2013 WL 6408512, at *2. The ALJ rejected a second doctor's contrary opinion, which was based on the conclusion that the claimant's disabling hypoxemia was due to nonpulmonary factors, because the ALJ found the conclusion to be speculative. *Id.* at *2–3. In affirming the ALJ's decision, the Board explained that the medical opinion that pneumoconiosis did not cause the disabling hypoxemia "does

not show that claimant does not have a totally disabling respiratory impairment pursuant to Section 718.204(b)(2)(iv)." *Id.* at *3.

Consequently, both *Bounds II* and *Street II* support the Director's argument that the total disability inquiry is distinct from the disability causation inquiry. In any event, the Board need not have relied on these cases in adopting the Director's argument that the ALJ erred by conflating the two because, as the Board stated in its opinion, the Director's argument is consistent with the relevant statutory and regulatory framework, to which we now turn.

The Employer asserts that the Act's unambiguous statutory language and its implementing regulations require the ALJ to determine if a miner had a respiratory or pulmonary impairment before invoking the presumption. Focusing on the use of "respiratory" and "pulmonary" to modify "impairment," the Employer argues that such language reveals Congress's intent to limit the invocation of the presumption to only respiratory and pulmonary impairments. Furthermore, the Employer asserts that the statutory and regulatory framework presumes that a miner's respiratory or pulmonary impairment is pneumoconiosis and it limits the rebuttal standard to establishing that the miner does not have pneumoconiosis or that the respiratory or pulmonary impairment did not arise out of coal mine employment. 30 U.S.C. § 921(c)(4); 20 C.F.R. § 718.305(d)(1).

Although we agree with the Employer that ALJs must find that a totally disabling respiratory or pulmonary impairment exists before the presumption may be invoked, it does not follow that the ALJ may discount evidence that otherwise shows a totally disabling respiratory or pulmonary impairment (*i.e.*

through blood gas results) simply because a physician opines that the cause of the impairment is cardiac-based. It is clear from the Act, the regulations, and Board precedent that an ALJ must decide whether a totally disabling respiratory or pulmonary disability exists before invoking the presumption, but that in doing so, the ALJ should not let medical opinion evidence about the cause of such respiratory or pulmonary impairment affect the analysis.

As for the Employer's argument that the Board blindly adopted the Director's factual findings, we hold that the Board acted within its scope of review and appropriately vacated and remanded the ALJ's decision as not supported by substantial evidence in the record. By noting that the ALJ mischaracterized an opinion and improperly discounted an opinion because the ALJ misapprehended the factual record, the Board is not usurping the ALJ's factfinding role. Rather, the Board is fulfilling its own role of ensuring the ALJ's findings of fact and conclusions of law are set aside if they are not supported by substantial evidence or in accordance with law. *See* 20 C.F.R. § 802.301(a).

The Employer's related theory that the Board forced the ALJ to blindly adopt the Director's factual findings also does not prevail. In its opinion, the Board simply instructed the ALJ on remand to "further consider[]" the evidence. We do not read the Board's opinion as coercing the ALJ to reach a certain result. Rather, the Board pointed out evidence that the ALJ should acknowledge, but that the ALJ was still free to weigh as the ALJ saw fit. Furthermore, a significant portion of the ALJ's decision on remand involved supplemental medical evidence to which the Board did not have access. Thus, the Board could not have controlled the ALJ's findings on remand

and the ALJ's ultimate decision on remand could not have been preordained.

The Board did not exceed its scope of review by vacating and remanding the ALJ's decision.

## C. Finding of Total Disability Established on Remand

The Employer also argues that the ALJ's findings on remand as to the total disability inquiry were not supported by substantial evidence and were contrary to law.

Starting with Dr. Tazbaz's opinion, the Employer assigns error to the ALJ's finding, "[u]pon further reflection," that Dr. Tazbaz's opinion was well-documented and well-reasoned. The Employer concedes that "[s]uch finding would be appropriate" if the ALJ had not merely copied such findings from the Board (which had blindly adopted the same findings from the Director's brief, according to the Employer). As noted above, however, we do not view the ALJ as thoughtlessly following the Board's directive. Based on the ALJ's decision, it is clear that the ALJ considered the relevant evidence (including a wealth of supplemental medical opinion evidence), made credibility determinations, and weighed differing opinions in order to reach his independent conclusion.

The Employer also argues that the ALJ's crediting of Dr. Tazbaz's opinion was not supported by the evidence because Dr. Tazbaz did not address: (1) how Ross's chronic obstructive pulmonary disease and coal workers' pneumoconiosis would cause oxygen desaturation with exercise; (2) why the pulmonary function test he performed on Ross produced qualifying results but the testing Dr. Tuteur performed on Ross four months later did not; or (3) what evidence or medical research existed to undermine Drs. Tuteur's and Selby's opinions. But,

the Employer's first argument is premised on importing the causation analysis into the disability analysis, in violation of statutory and regulatory language. Dr. Tazbaz did not need to explain why chronic obstructive pulmonary disease or coal workers' pneumoconiosis would cause Ross's desaturation with exercise in order for the ALJ to be able to rely on his opinion as evidence of a totally disabling pulmonary impairment; the ALJ may rely on Dr. Tazbaz's conclusion that Ross produced qualifying blood gas results as evidence of total disability, even if Dr. Tazbaz believes the cause of the results is nonpulmonary. *See Midland Coal Co.*, 358 F.3d at 493. As to the second and third arguments, the record shows that Dr. Tazbaz discussed the other doctors' opinions enough to support the ALJ's finding that Dr. Tazbaz's opinion was credible. The statutory and regulatory framework do not require Dr. Tazbaz to respond to every conflicting data point with a counterpoint or resolution; that Dr. Tazbaz considered Ross's full medical record before making a medical judgment as to Ross's diagnoses was sufficient.

Next, the Employer challenges the ALJ's finding on remand that Dr. Tuteur deemed Ross to have a totally disabling pulmonary impairment. According to the Employer, it was just the opposite: Dr. Tuteur found Ross's cardiac condition to be the cause of the disability. And the Employer argues that the ALJ's decision should be vacated because ALJs are not allowed to mischaracterize a physician's opinion or to substitute their own findings for that of a physician's. Again, the Employer seeks to use the doctor's opinion that a cause of an impairment is nonpulmonary to remove evidence of a totally disabling pulmonary impairment from the ALJ's considera-

tion. To do so is improper under the statute and the regulations; the ALJ reached an appropriate finding as to Dr. Tuteur's opinion of a totally disabling pulmonary impairment.

Lastly, the Employer disputes the ALJ's decision to accord Dr. Selby's opinion that Ross did not have a pulmonary disability little weight, emphasizing that Dr. Selby's opinion was supported by Dr. Tuteur's testing in 2012 and by Dr. Selby's review of all the materials. Notwithstanding the parts of the record that support Dr. Selby's opinion, the ALJ may nevertheless decide that, on balance, Dr. Selby's opinion was not well-reasoned because Dr. Selby did not discuss the qualifying blood gas studies or why Ross would be capable of performing his usual coal mine employment.

In general, the Employer's theory that something must be amiss because the ALJ changed his mind on remand is particularly unpersuasive here because the parties submitted five additional medical opinions after the Board's second decision. Those supplemental medical opinions presented new information for the ALJ to consider, which ultimately altered the ALJ's credibility determinations. For the first time on remand, the doctors were able to consider the complete results of the 100% blood gas study, which formed the basis of Dr. Tuteur's conclusion that a shunt caused Ross's hypoxemia. Relevant here, Dr. Tazbaz cast doubt on Dr. Tuteur's use of the blood gas study to identify a shunt given that the preferred way to determine the presence of a shunt is an echocardiogram with a bubble study, which Dr. Tuteur did not perform. Moreover, Dr. Tazbaz noted that Ross's treatment records relating to his coronary artery bypass graft surgery showed that his heart and the bypass were functioning

properly and that his heart disease had been treated surgically, so it could not be the cause of any major issues for Ross. In their second supplemental opinions, neither Dr. Tuteur nor Dr. Selby could refute the utility of a bubble study to confirm the presence of a shunt, nor did they explain how, in spite of Ross's positive cardiac-related medical history, Drs. Tuteur and Selby nevertheless believed Ross's impairment was cardiac-based and not pulmonary-based.

We hold that the ALJ's decision to accord more weight to Drs. Tazbaz's and Tuteur's opinions—because he considered those opinions better-reasoned than Dr. Selby's and found them supported by the medical evidence—was rational, supported by substantial evidence, and in accordance with applicable law. In turn, we conclude that the Board appropriately affirmed the ALJ's decision that Ross proved by a preponderance of the evidence that he was totally disabled under 20 C.F.R. § 718.204(b)(2)(iv), that the evidence was sufficient to establish total disability pursuant to 20 C.F.R. § 718.204(b)(2), and that Ross invoked the fifteen-year presumption under 30 U.S.C. § 921(c)(4).

### D. Finding that Presumption Was Not Rebutted on Remand

After invoking the fifteen-year presumption on remand, the ALJ addressed whether the Employer rebutted it. Employers face an "uphill battle" in attempting to rebut the presumption. *R & H Steel Bldgs., Inc. v. Dir., Office of Workers' Comp. Programs*, 146 F.3d 514, 518 (7th Cir. 1998). But, the Employer

advances several theories as to why the ALJ's decision that it did not rebut the presumption should be vacated.

First, the Employer argues that because the ALJ only considered whether the Employer could rebut legal pneumoconiosis, the ALJ failed to review all the medical evidence, which was contrary to law. This argument misses the mark. While the ALJ was required to review all medical evidence before determining if a total disability existed, the Employer does not cite any authority to support the notion that the ALJ may not decide that the employer cannot rebut the presumption because the employer cannot rebut one of the requisite elements. *See* 20 C.F.R. § 718.305(d)(1)(i).

Next, the Employer objects that the invocation of the presumption yields only a presumption of clinical pneumoconiosis. But, this argument contravenes the statutory and regulatory framework. Section 921(c)(4) specifically provides that the fifteen-year presumption is triggered when a miner is disabled or has died from "pneumoconiosis," and both the statutory and the regulatory definitions of pneumoconiosis are broad: "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b); 20 C.F.R. § 718.201(a). And as noted above, the regulation further specifies that this broad definition includes "clinical" and "legal" pneumoconiosis. 20 C.F.R. § 718.201(a). There is no suggestion that Congress sought to limit the application of the presumption to only clinical pneumoconiosis. In fact, there is persuasive authority from other courts of appeals that have considered this precise issue and held that the plain language of §§ 902(b) and 921(c)(4) leads to the conclusion that the presumption applies to both clinical and legal pneumoconiosis.

*See Consolidation Coal Co. v. Dir., Office of Workers' Comp. Programs*, 864 F.3d 1142, 1147 (10th Cir. 2017); *Barber v. Dir., Office of Workers' Comp. Programs*, 43 F.3d 899, 901 (4th Cir. 1995).

The Employer argues that research concerning the fifteen-year presumption showed that the likelihood of a miner developing clinically significant legal pneumoconiosis was only 14.2% for smoking miners and 7.7% for nonsmoking miners with "high exposure" to coal mine dust over varying lengths of time. *See* Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79920-01, 79940-01 (Dec. 20, 2000). And the Employer argues that this data revealed that even if the "high exposure" miners worked in the mines for over fifteen years, 85.8% of them would not develop legal pneumoconiosis, and yet 88% of them did develop clinical pneumoconiosis. The Employer thus argues there is insufficient evidence to support a presumption that a miner with chronic obstructive pulmonary disease and at least fifteen years of coal mine employment has legal pneumoconiosis. Given that the law requires a logical connection between the proven fact and the presumed conclusion, the Employer reasons that the fifteen-year presumption does not apply to legal pneumoconiosis. *See Mullins Coal Co. v. Dir., Office of Workers' Comp. Programs*, 484 U.S. 135, 137, 158–59 (1987) (recognizing the "need for a logical connection between the proven fact and the presumed conclusion" in reference to the interim presumption of eligibility for black lung benefits claims filed between July 1, 1973, and April 1, 1980).

In response, the Director points to an opinion from the Tenth Circuit that considered and rejected the same argument:

> We fail to see how this study sheds light on Con-
> gress' intent as to the fifteen-year presumption.
> But in any event, the study is inapposite. It re-
> flects the incidence of respiratory impairment
> among <u>all</u> miners, healthy or unhealthy. The fif-
> teen-year presumption requires a claimant to
> demonstrate that he is totally disabled due to a
> respiratory condition, § 921(c)(4), and thus min-
> ers who successfully invoke the presumption
> have already shown that they fall within the
> class of miners with significant pulmonary dys-
> function.

*Consolidation Coal*, 864 F.3d at 1148 n.2. We agree with the
Tenth Circuit that the presumption is reasonable for legal
pneumoconiosis. And we do not conclude that the presump-
tion only applies to clinical pneumoconiosis.

Finally, the Employer argues that the ALJ's interpretation
of the rebuttal requirements was erroneous and should be va-
cated. The parties devote pages to analyzing, criticizing, and
distinguishing the medical opinion evidence. But, in consid-
ering whether there is support for the Employer's attempt to
rebut the presumption, the medical opinion evidence may be
simplified as a disagreement between three qualified physi-
cians as to the cause of Ross's qualifying test results. We may
not reweigh the medical opinion evidence. It was rational for
the ALJ to discredit the opinions of Drs. Tuteur and Selby to
the extent they concluded that Ross did not suffer from a pul-
monary impairment because those opinions did not explain
how they eliminated Ross's thirty years of coal mine dust ex-
posure as a potential cause of his pulmonary impairment, or
how they concluded Ross does not have chronic obstructive

pulmonary disease given the years of medical treatment records documenting the condition and the CT scan reading of mild to moderate emphysema. Similarly, it was rational for the ALJ to reject Drs. Tuteur's and Selby's opinions that a shunt was the sole cause of Ross's disability given that those doctors did not diagnose pneumoconiosis and they did not address contrary medical evidence of record, namely Dr. Tazbaz's normal cardiac test results and Ross's extensive cardiac treatment records that lacked any mention of a shunt.

Substantial evidence supports the ALJ's decision to give little weight to the disability causation opinions of Drs. Tuteur and Selby. Given that those were the only opinions the Employer could rely on to support its effort to rebut the presumption, and the ALJ reasonably discredited them, we hold that the Board appropriately affirmed the ALJ's finding that the Employer did not rebut the presumption.

### III. Conclusion

For the foregoing reasons, we ENFORCE the Board's decision affirming the ALJ's determination that Ross is entitled to benefits under the Act.