# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 01-3211 & 01-3998

ZEIGLER COAL COMPANY,

*Petitioner*,

*v.*

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,
and WILLIAM E. HAWKER,

*Respondents*.

Petitions for Review of Decisions and Orders
of the Benefits Review Board,
United States Department of Labor.

ARGUED SEPTEMBER 12, 2002—DECIDED APRIL 18, 2003

Before RIPPLE, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Eleven years ago, William
Hawker, a coal miner, filed a claim for black lung bene-
fits pursuant to the Black Lung Benefits Act, 30 U.S.C.
§ 901 *et seq.*, and was granted benefits based in part on
a finding of complicated pneumoconiosis. He was also
awarded fees for the work of his attorneys and medical
experts. Zeigler Coal, Hawker's employer, asks this court
to reexamine the final grant of benefits and the award of
attorney and expert fees. It argues that the Administra-
tive Law Judge (ALJ) failed to weigh all relevant evidence
before determining that Hawker had complicated pneumo-
coniosis, which entitled him to an irrebuttable presumption

of pneumoconiosis and thereby black lung benefits, and improperly awarded attorneys' fees based on inadequate fee affidavits. We disagree. Zeigler also argues that Hawker was not entitled to recover the fees for his medical experts because they only submitted medical reports and were not "necessary witnesses attending the [ALJ] hearing" under section 28(d) of the Longshoremen's Act. We find, however, that section 28(d) does provide for the recovery of fees for medical experts who submit medical reports but do not attend the ALJ hearing and provide oral testimony. Therefore, we affirm the ALJ's decisions.

## I. BACKGROUND

William Hawker applied for black lung benefits in 1981, while he was still working for Zeigler Coal; his claim was denied. He retired five years later, after a thirty-eight year career, and filed a second claim for benefits in 1992. The Department of Labor reexamined his claim in 1993 and determined that he was entitled to benefits. Zeigler appealed, and the matter was referred to the Office of Administrative Law Judges. In 1998, Administrative Law Judge Rudolf L. Jansen reviewed the medical reports of twenty physicians and determined that Hawker had complicated pneumoconiosis, which entitled him to an irrebuttable presumption of pneumoconiosis, and awarded him black lung benefits and fees for the work of his attorneys and medical experts. Zeigler, responsible for reimbursing the government for the benefits, appealed to the Benefits Review Board, which affirmed the ALJ decision and denied Zeigler's motion for reconsideration.

## II. ANALYSIS

A. The Award of Black Lung Benefits

Zeigler appeals from a decision of the Benefits Review Board, but we actually review the decision of the ALJ,

asking whether his decision is supported by substantial evidence, in accord with the law, and is rational. *Amax Coal Co. v. Director, Office of Workers' Comp. Programs*, 312 F.3d 882, 887 (7th Cir. 2002); *Zeigler Coal Co. v. Kelley and Office of Workers' Comp. Programs*, 112 F.3d 839, 841 (7th Cir. 1997); *Peabody Coal Co. v. Helms*, 859 F.2d 486, 489 (7th Cir. 1988). We affirm the findings of the ALJ if they are supported by relevant evidence that a "rational mind might accept as adequate to support a decision." *Amax Coal Co. v. Beasley*, 957 F.2d 324, 327 (7th Cir. 1992); *see also Peabody Coal Co. v. Vigna*, 22 F.3d 1388, 1392 (7th Cir. 1994). The ALJ must consider all relevant medical evidence, refrain from substituting his layman's expertise for that of qualified experts, and, absent evidence to the contrary or a legal basis, must not disregard the opinions of qualified experts. *See Kelley*, 112 F.3d at 841; *Vigna*, 22 F.3d at 1392; *Witherell v. Director, Office of Workers' Comp. Programs, U.S. Dept. of Labor*, 812 F.2d 376, 382 (7th Cir. 1987). The ALJ makes factual determinations; we do not reweigh the evidence or make credibility determinations, and we reserve only questions of law for de novo review. *See Kelley*, 112 F.3d at 841; *Vigna*, 22 F.3d at 1392; *Summers v. Freeman United Coal Mining Co.*, 14 F.3d 1220, 1223 (7th Cir. 1994); *Keeling v. Peabody Coal Co.*, 984 F.2d 857, 862 (7th Cir. 1993).

The Black Lung Benefits Act provides benefits to coal miners who are totally disabled by pneumoconiosis and to surviving dependents of miners who died as a result of pneumoconiosis. *See* 30 U.S.C. § 910; *Kelley*, 112 F.3d at 842. Miners may rely on statutory and regulatory presumptions to establish disability due to pneumoconiosis. *Id.*; *Freeman United Coal Mining Co. v. Foster*, 30 F.3d 834, 836 (7th Cir. 1994). In Hawker's case, the ALJ found that Hawker had pneumoconiosis due to x-ray, biopsy, and physician opinion evidence, *see* 20 C.F.R. § 718.202(a)(1)-(2), (4), and that he was entitled to an irrebuttable presump-

tion that he had pneumoconiosis due to x-ray and biopsy evidence of complicated pneumoconiosis, an aggravated form of pneumoconiosis. *See* 20 C.F.R. §§ 718.202(a)(3); 718.304. Zeigler challenges the invocation of the irrebuttable presumption, arguing that the ALJ failed to consider all relevant evidence and failed to provide the reasons and bases for his finding of complicated pneumoconiosis.

Complicated pneumoconiosis may be established by (1) chest x-rays that yield one or more large opacities, defined as greater than one centimeter in diameter, and classified as Category A, B, or C according to the ILO-U/C classification system; (2) biopsy or autopsy findings of massive lesions in the lungs; or (3) other means that could reasonably be expected to yield the results described in the prior two methods. 20 C.F.R. § 718.304. In the present case, the ALJ determined that Hawker suffered from complicated pneumoconiosis based on the x-ray readings of four physicians dually-qualified as B-readers[1] and Board Certified Radiologists (BCRs), and one physician qualified only as a B-reader. They all found the large opacities necessary to find complicated pneumoconiosis, with one of the BCR/B-readers finding large opacities from three separate readings. In addition, contrary to Zeigler's claim that the ALJ did not consider all relevant evidence, the ALJ specifically indicated that he also relied on the readings of two dually-qualified BCR/B-readers and two B-readers who failed to observe the presence of large opacities, one of them failing to do so despite five separate readings.

Zeigler argues that the ALJ "did not explain why he rejected [one doctor's] opinion that the ability to read multiple films enabled him to render a more accurate assessment than the readers who interpreted only one

---

[1]   "B-readers" are a specially-skilled subset of x-ray readers.

or two films," and did not provide a "rationale for crediting [another doctor's] opinion on the biopsy or for discrediting . . . contrary views." While the ALJ could have gone into greater detail in explaining why he favored one doctor's finding over another, that does not mean the ALJ did not in fact weigh all relevant evidence to find complicated pneumoconiosis. Zeigler further undermines its argument, however, when it quotes from the ALJ's finding, which explicitly stated that all relevant evidence was weighed and explained why greater weight was given to some opinions over others (Zeigler claims that this is a "simple declar[ation]").

> *Weighing together* the biopsy, x-ray, and other medical evidence, . . . the existence of complicated pneumoconiosis is established. . . . Although I find [four of the doctors who did not find pneumoconiosis] to be highly qualified, Board certified physicians, their opinions are not supported by the x-ray interpretations of the most qualified readers. I am persuaded by the large number of dually qualified readers who found large opacities and by the [one doctor's] opinion from the biopsy slides that Mr. Hawker has progressive, massive fibrosis. See 20 C.F.R. § 304(b). I note that the majority of the most highly qualified readers found evidence of complicated pneumoconiosis and that this finding is supported by the biopsy evidence of . . . a Board Certified pathologist. Additionally, I note that [two doctors] found CT evidence of large opacities. Accordingly, I find that complicated pneumoconiosis is established and that pneumoconiosis may be presumed pursuant to 718.304.

(Emphasis added.)

Zeigler asserts that the ALJ provided no rationale for crediting the positive readings over the negative ones, and

that the only rationale for the ALJ's credibility finding is his purported "nose counting" of the number of witnesses. *Sahara Coal Co. v. Fitts*, 39 F.3d 781, 782 (7th Cir. 1994). However, as in *Kelley*, the ALJ in the present case did not mechanically count votes, but rather outlined and considered the conclusions of all reports and the qualifications of all readers before making his determination. In addition, the ALJ indicated that he gave greater weight to the opinions of "dually qualified" physicians, those of "the most qualified" physicians, and that of a "Board Certified pathologist." Furthermore, the ALJ properly cited Board precedent for the proposition that he may assign heightened weight to the interpretations by physicians with superior radiological skills. *See Kelley*, 112 F.3d at 842-43.

We find that the ALJ properly weighed all relevant medical evidence, and refrained from substituting his layman's expertise for that of qualified experts, in finding that Hawker suffered from complicated pneumoconiosis and was therefore entitled to an irrebuttable presumption of pneumoconiosis. Because his findings are rational, supported by substantial evidence, and follow the law, we affirm his finding that Hawker was entitled to black lung benefits and affirm the judgment of the Benefits Review Board to that effect.

B.  The Award of Medical Expert Fees and Attorneys' Fees

Zeigler objects to the ALJ's determination, and the Board's affirmation, that Hawker is entitled to an award of fees for the work of his medical experts and attorneys. Zeigler argues that there is no statutory authority for the ALJ and Board to award Hawker fees for the work of his medical experts and that the Board improperly awarded him his attorneys' fees. We disagree.

1.   The award of medical expert fees.

Each party in a lawsuit ordinarily bears the burden of its own attorneys' fees unless there is express statutory authorization to the contrary. *Buckhannon Bd. & Care Home, Inc. v. W.V. Dep't of Health & Human Servs.*, 532 U.S. 598, 602 (2001) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)); *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983). Section 28 of the Longshoremen's Act provides the authority for fee and cost-shifting in black lung cases. 30 U.S.C. § 932(a). Section 28(d) of the Longshoremen's Act provides:

> In cases where an attorney's fee is awarded against an employer or carrier there may be further assessed against such employer or carrier as costs, fees and mileage for necessary witnesses attending the hearing at the instance of claimant. Both the necessity for the witness and the reasonableness of the fees of expert witnesses must be approved by the hearing officer, the Board, or the court, as the case may be. The amounts awarded against an employer or carrier as attorney's fees, costs, fees and mileage for witnesses shall not in any respect affect or diminish the compensation payable under this chapter.

33 U.S.C. § 928(d). Zeigler argues that section 28(d) does not provide statutory authority to shift the cost of fees charged by Hawker's medical experts. It relies on *W.V. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83 (1991), to support is position, but *Casey* is inapposite. *Casey* dealt with the recovery of expert fees under the former 42 U.S.C. § 1988, the text of which only provided for the recovery of attorneys' fees.[2] That is not the case here; the text of section

---

[2] Congress legislatively overruled *Casey* by amending § 1988 to provide that a court, in its discretion, may include expert

(continued...)

28(d) of the Longshoremen's Act addresses "the reasonableness of the fees of the *expert witness*" within the context of assessing "as costs, fees and mileage for necessary witnesses" to an employer against whom attorneys' fees also were assessed. Indeed, the Supreme Court in *Casey* cited section 28(d) as one of the statutes that "explicitly shift[s] attorney's fees *and* expert witness fees." 499 U.S. at 92 and n.4 (emphasis in original).

Zeigler next posits that the fees of a medical expert may not be shifted when that expert does not formally attend the hearing but instead submits medical reports that are admitted into evidence before the ALJ. According to Zeigler, the plain language of section 28(d) limits fees for witnesses to "necessary witnesses *attending* the hearing at the instance of the claimant." (Emphasis added.) The Director asserts that expert fees are recoverable whether or not the expert actually appears at a hearing.[3]

---

[2] (...continued)
fees as part of the attorneys' fee award. *See* Pub. L. 102-66, § 113(a)(2), codified at 42 U.S.C. § 1988.

[3] The Benefits Review Board has a long history of awarding claimants the fees for their expert medical reports when the physicians do not appear at the oral hearing. *See, e.g.*, *Branham v. E. Assoc. Coal Corp.*, 19 Black Lung Rep. 1, OWCP No. 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, BRB No. 91-2179 BLA, 1994 DOLBRB LEXIS 639, at *4 (Ben. Rev. Bd. 1994) (rejecting a *Casey* argument that an employer could not be liable for costs of a deposition witness who did not appear and testify at a hearing, and stating that "the Board has previously interpreted this statutory language and held that an expert need not testify at the administrative hearing in order for claimant's counsel to be reimbursed for the costs of obtaining a physician's opinion") (citing *Hardrick v. Campbell Inds., Inc.*, 12 B.R.B.S. 265, 270 (1980); *Vacchio v. Sun Shipbuilding & Dry Dock Co.*, 16 B.R.B.S. 190, 195 (1984); *Cahill v. Int'l*
(continued...)

We begin our analysis of Zeigler's claim by looking at the language of the statute. The primary rule of statutory interpretation is that words used in statutes must be given their ordinary and plain meaning. *United States v. Wilson*, 159 F.3d 280, 291 (7th Cir. 1998). Zeigler argues that the word "attend" means "to be present at." However, the word has alternative meanings that we find instructive. For instance, Webster's indicates that "attend" can also mean "to be present,""to take care of, minister to," "to serve," and "to take care or charge." *See* WEBSTER'S COLLEGE DICTIONARY 85 (2nd ed. 1997). Indeed, the term "present" itself is not dispositively clear, as its definition includes the terms "being . . . under consideration" and "being before the mind." *Id*. at 1029. Accordingly, we do not find the word "attending" to be unambiguous, and believe that in the context of these hearings it includes the testimony and reports of expert witnesses that have been presented to the ALJ and thus are "under consideration" and "before the mind."

We note that other terms in the statute perhaps appear clear in isolation, but are similarly indefinite and ambiguous in the context of the statute and regulations. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Boim v. Quranic Literacy Inst. and Holy Land Found. For Relief & Dev.*, 291 F.3d 1000, 1009 (7th Cir. 2002). For example, the term "hearing" is not defined in the statute or the regulations and is used with qualifying

---

[3] (...continued)
*Terminal Operating Co., Inc.*, 14 B.R.B.S. 483, 489 (1981); *Pernell v. Capitol Hill Masonry*, 11 B.R.B.S. 532, 541 (1979)).

language in the regulations,[4] which indicates that there are various types of hearings in black lung cases.[5] Thus, we cannot conclude that "hearing" used in this context necessarily means an oral presentation of evidence at a set date and time, as Zeigler contends. *See United States Ex Rel Stinson v. Prudential Ins.*, 944 F.2d 1149, 1155 (3d Cir. 1991) (In "civil contexts the term 'hearing' does not necessarily take the form of a live, formal proceeding."). The word "witness" similarly is not defined in the statute or regulations, and its various definitions lead us to conclude that it does not mean solely "a person who gives oral testimony at a hearing."[6] In addition, the statutes and regulations provide that a witness may testify by means of a written document. *See, e.g.*, 33 U.S.C. § 924, *incorporated by* 30 U.S.C. § 932(a) (the "testimony of any witness may be taken by deposition or interrogatories"); *Richardson v. Perales*, 402 U.S. 389, 406 (1971) (holding due process not

---

[4] The regulation subpart governing hearings, 20 C.F.R. § 725 Subpart F, uses the terms "hearing," *id.* §§ 725.450 *et seq.*, "full evidentiary hearing," *id.* § 725.452(c), "oral hearing," *id.* § 725.452(d), and "formal hearing," *id.* § 725.454(a).

[5] Indeed, Webster's indicates "hearing" can mean an "opportunity to be heard" or "a session in which testimony and arguments are presented." WEBSTER'S COLLEGE DICTIONARY 599 (2nd ed. 1997). Black's Law Dictionary echoes this by defining "hearing" as "any setting in which an affected person presents arguments to an agency decision-maker." BLACK'S LAW DICTIONARY 725 (7th ed. 1999).

[6] The dictionary defines a witness as including "one who is able to attest as to what took place," "a person who gives testimony," "a person or *thing serving as evidence*," or "*testimony or evidence*." WEBSTER'S COLLEGE DICTIONARY 1476-77 (2nd ed. 1997) (emphasis added). Black's defines witness as "one who sees, knows, or vouches for something," and "one who gives testimony under oath or affirmation (1) in person, (2) by oral or written deposition, or (3) by affidavit." BLACK'S LAW DICTIONARY 1596 (7th ed. 1999).

violated by introduction of an *ex parte* hearsay medical report); 20 C.F.R. § 725.458 ("The testimony of any witness . . . may be taken by deposition or interrogatory. . . .").[7] Indeed, the Longshore Men's Act incorporates the hearing provisions of the Administrative Procedures Act (APA), 33 U.S.C. § 919(d), which allow for evidence to be submitted on the record without a formal hearing. 5 U.S.C. §§ 554(d), 556(d).

Reading this statute in context of the usual practice under the BLBA, *see Krzalic v. Republic Title Co.*, 314 F.3d 875, 879-80 (7th Cir. 2002), we give deference to the director's longstanding and reasonable interpretation of the statute.[8] *Barnhart v. Walton*, 535 U.S. 212, 122 S. Ct. 1265, 1270 (2002); *North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 522 n.12; *cf. Heinz v. Cent. Laborers' Pension Fund*, 303 F.3d 802, 812 n.17 (7th Cir. 2002). In most black lung cases, the parties present evidence in the form of medical reports and other written testimony; seldom do doctors and medical experts appear at an oral hearing to present evidence. Indeed, ALJs typically schedule numerous "hearings" on the same day, allotting no more than an hour or two for the introduction of evidence in the form of narrative reports and deposition testimony. If oral testimony of all medical experts were required in order for a

---

[7] Testimony also is not defined in the statute or regulations. The dictionary defines "testimony" as "evidence in support of a fact or statement," WEBSTER'S COLLEGE DICTIONARY 1330 (2nd ed. 1997), and Black's defines it as "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition." BLACK'S LAW DICTIONARY 1485 (7th ed. 1999). "Expert testimony" is also termed "expert evidence," which is defined as "[e]vidence about a scientific, technical, or professional issue given by a person qualified to testify because of familiarity with the subject or special training in the field." *Id.* at 577-78.

[8] *See supra* note 3 and accompanying text.

successful claimant to recover their fees, hearings could take more than a day and would be more expensive (with the additional expense also shifting to the employer), medical experts would be unwilling to provide the necessary medical reports because of the time out of their practice that would accompany appearing at such hearings (the dates of which typically change), and the administration of the black lung program would be unduly burdened. *See Republic Steel Corp. v. Leonard*, 635 F.2d 206, 210 (3d Cir. 1980) (noting the "undesirable burden that would be placed on both the administration of the black lung program and on the energy of the nation's physicians if black lung medical examiners were required to attend each hearing").

We therefore reject Zeigler's argument that Hawker can only recover the fees of his medical experts if they appear at the ALJ hearing, and hold that such fees may be recovered when their medical reports are submitted as evidence before the ALJ.

### 2.   The award of attorneys' fees.

In reviewing Zeigler's specific challenges to the attorneys' fees award, we give great deference to the views and conclusions of the ALJ. *Ustrak v. Fairman*, 851 F.2d 983, 987 (7th Cir. 1988); *see also Tenner v. Zurek*, 168 F.3d 328, 329 (7th Cir. 1998) (citing *LaMotte v. Roundy's, Inc.*, 27 F.3d 314, 315 (7th Cir. 1994)). We review the question of reasonableness of time spent by a lawyer on a particular task in the course of litigation under a highly deferential version of the "abuse of discretion" standard. *See Ustrak*, 851 F.2d at 987. "Not only is the [ALJ] in a much better position than the appellate court to make this determination, but neither the stakes nor the interest in uniform determination are so great as to justify microscopic appellate scrutiny." *Id.*

Contrary to Zeigler's contention, Hawker's counsel provided complete, itemized statements requesting fees for services in representing Hawker in the initial appeal and in defense of the fee petition. These statements described the extent and character of the necessary work done before the Board and indicated the professional status and the customary hourly billing rate for the attorneys who performed the work. The ALJ reviewed the hourly rates and concluded they were reasonable after considering the quality of the legal representation provided, the qualifications of Hawker's counsel, and the complexity of the legal issues involved in the case. *See* 20 C.F.R. § 725.366(b). Zeigler offered no evidence to support its contention that the rates charged are improper or unreasonably high.[9] Therefore, we do not find an abuse of discretion in the ALJ's determination that the attorneys' fees requested were reasonable.

Zeigler next argues that the ALJ improperly awarded attorneys' fees for the attorneys' performance of clerical tasks and office overhead (postage and photocopying). We disagree. The ALJ specifically reviewed the entries that Zeigler claims constituted "clerical tasks" and found that counsel's work was more than just clerical; counsel conducted telephone conferences with doctors and reviewed doctors' reports. As for the overhead costs, the ALJ accepted as reasonable Hawker's assertion that the postage

---

[9]  Zeigler argues that there is no support for awarding fees in this case because one of Hawker's counsel conceded that he charged a higher rate for black lung cases. However, counsel indicated that he charged this higher rate because of his experience with black lung cases. The ALJ found this reasonable, and we do not find this conclusion to be an abuse of discretion. Furthermore, even if the ALJ had found that such a rate was unreasonable, that would hardly be "dispositive in demonstrating the absence of any support for the award of fees," as Zeigler contends.

and photocopying costs were necessary to successfully prosecute this case as the physicians needed a complete copy of the record to provide a written report on Hawker's behalf. Because the ALJ is in a much better position than the appellate court to make this determination, we do not find these conclusions to be an abuse of discretion.

Finally, Zeigler argues that the ALJ improperly awarded fees to the attorneys for their work defending the their fee application and responding to interrogatories. We disagree and believe that § 928(d) actions should be treated similar to § 1988 actions, so that fees awarded under the statute are not diminished by the cost of bringing a legitimate petition for attorney's fees. *See Kerns v. Consolidation Coal Co.*, 247 F.3d 133, 134 (4th Cir. 2001) (holding that § 928(a) actions should be treated similar to § 1988 actions); *cf. Ustrak v. Fairman*, 851 F.2d 983, 990 (7th Cir. 1988) (approving fee-shifting for defending fee applications in the context of civil rights suits).

## III.  CONCLUSION

For the reasons stated above, the Board's orders are ENFORCED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—4-18-03