In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-2521

APOGEE COAL COMPANY, *et al.*,

*Petitioners*,

*v.*

OFFICE OF WORKERS' COMPENSATION PROGRAMS,

*Respondent.*

Petition for Review of an Order of the
Benefits Review Board.
No. 22-0262 BLA

ARGUED MAY 13, 2024 — DECIDED AUGUST 19, 2024

Before SCUDDER, ST. EVE, and PRYOR, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Harold Grimes developed black lung disease after 34 years of working in coal mines. He died of lung cancer in 2018. It is undisputed that Grimes's spouse, Susan, is eligible for survivor's benefits under the Black Lung Benefits Act. This appeal requires us to decide who must pay those benefits. A Department of Labor administrative law judge assigned financial responsibility to Apogee Coal Company—Grimes's last employer—and the Benefits Review

Board affirmed. Central to both decisions was the conclusion that Arch Resources Inc.—Apogee's former parent corporation—bore responsibility for paying the benefits on Apogee's behalf. Arch disagrees and insists that Mrs. Grimes's benefits must instead come from the Black Lung Disability Trust Fund. On the record before us, we agree with Arch. Neither the ALJ nor the Board has identified any provision (or combination of provisions) in the Act or its implementing regulations that justify holding Arch liable for the benefits obligations of Apogee. So we grant Arch's petition for review, vacate the Board's decision, and remand with instructions that Mrs. Grimes's benefits be assigned to the Trust Fund.

**I**

**A**

The Black Lung Benefits Act provides disability benefits to miners "totally disabled" due to black lung disease. See *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 108 (1988); see also 30 U.S.C. §§ 901(a), 922(a), 932(c). It does so largely at the expense of the mining industry itself. Whenever possible, the statute assigns financial responsibility for a miner's benefits to one of the coal mine operators in whose service the miner developed black lung disease. See *Old Ben Coal Co. v. Luker*, 826 F.2d 688, 693 (7th Cir. 1987); see also 30 U.S.C. § 932(c); 20 C.F.R. § 725.495(a)(1). When no such entity is capable of paying, the cost of benefits falls to the Black Lung Disability Trust Fund, see 26 U.S.C. § 9501(d)(1)(B), which is jointly administered by the Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health and Human Services, see *id.* § 9501(a)(2), and funded by an excise tax on coal, see *id.* §§ 9501(b)(1), 4121(a)(1).

The Department of Labor adjudicates benefits claims under the Act. See 30 U.S.C. § 932a; see also *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 717 (1990) (describing administrative scheme). The Department's Division of Coal Mine Workers' Compensation performs this work in field offices across the nation. 30 U.S.C. § 903(a); see also DCMWC Offices and Leadership, https://www.dol.gov/agencies/owcp/dcmwc/districtoffices, archived at [perma.cc/8EVQ-CETS].

The processing of black lung claims occurs in three stages. The district director for the field office that received the claim undertakes the initial review, including by examining the applicant's employment history, see 20 C.F.R. § 725.404(a), and notifying those coal mine operators, if any, that are potentially responsible for paying benefits under the statute. See *id.* § 725.407(a)–(b); see also *Rockwood Cas. Ins. Co. v. Director, Off. of Workers' Compensation Programs*, 917 F.3d 1198, 1205–06 (10th Cir. 2019) (discussing notification process). Absent the requisite notice, liability for benefits obligations cannot be imposed on a coal mine operator. See 20 C.F.R. § 725.360(a)(3). In addition to fulfilling these threshold functions, district directors have substantial authority to gather evidence, see *id.* § 725.404, develop the medical record, see *id.* § 725.414, and hear argument from interested parties, see *id.* §§ 725.408(a)(2), 725.412(a)(1), 725.416(a).

The work of the district director culminates in the issuance of a decisional document called a preliminary decision and order (or PDO for short) that "resolve[s] [the] claim on the basis of the evidence submitted to or obtained by the district director." *Id.* § 725.418(a). In any case in which the district director awards benefits, it must designate the coal mine operator, if any, that the Act and its implementing regulations make

liable for the miner's benefits. See *id.* § 725.418(d). Absent such a designation, the district director must assign the claim and attendant payment obligation to the Trust Fund. See 26 U.S.C. § 9501(d)(1)(B).

The Act and its regulations establish a two-step procedure for determining which employer, if any, is liable for awarded benefits. A district director first identifies each of the miner's previous employers that qualify as a so-called potentially liable operator under five criteria enumerated in 20 C.F.R. § 725.494(a)–(e). Only the fifth of these criteria is contested in this appeal—that "[t]he operator [be] capable of assuming [] liability for the payment of continuing benefits …." *Id.* § 725.494(e). After identifying the pool of potentially liable operators, the district director must then select a single responsible operator according to the formula prescribed by a neighboring regulation, § 725.495. As a general rule, that regulation makes liable "the potentially liable operator … that most recently employed the miner." *Id.* § 725.495(a)(1).

Parties dissatisfied with a district director's PDO may seek referral to an ALJ for a formal hearing to resolve any contested issue. See *id.* §§ 725.450, 725.451. In most respects, the district director's findings do not bind the ALJ. The ALJ may not, however, revisit the district director's decision to designate a particular employer as the financially liable operator under the Act's liability rules. See *Rockwood Cas. Ins. Co.*, 917 F.3d at 1215. If the ALJ determines that the district director designated the wrong entity, "a new responsible operator may not be named." *Id.* The benefits are instead paid out of the Trust Fund. See Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79990 (Dec. 20, 2000) ("In the event the responsible

operator designated by the district director is adjudicated not liable for a claim, the Black Lung Disability Trust Fund will pay any benefit award.").

A party that disagrees with an ALJ's decision may challenge it before the Benefits Review Board. See 33 U.S.C. § 921(b); 20 C.F.R. § 802.205(a). The Board's authority is strictly appellate—it may not "engage in a *de novo* proceeding or unrestricted review of a case brought before it." 20 C.F.R. § 802.301(a). Board decisions may be appealed to the court of appeals "for the circuit in which the [claimant's] injury occurred." 33 U.S.C. § 921(c).

B

To ensure that potentially liable operators have the financial ability to pay benefits, Congress has mandated that all operators either acquire a commercial insurance policy covering their black lung liability or receive the Department of Labor's approval to self-insure. See 30 U.S.C. § 933(a); 20 C.F.R. § 726.1; see also *Lovilia Coal Co. v. Williams*, 143 F.3d 317, 319–20 (7th Cir. 1998) (explaining that operators that fail to do one or the other "may be punished by civil penalty").

The self-insurance option permits an operator to satisfy its financial obligations under the Act by demonstrating to the Department's satisfaction that it has sufficient resources to forgo the procurement of commercial insurance coverage.

An operator seeking to self-insure must, at a minimum, satisfy several threshold requirements enumerated in 20 C.F.R. § 726.101(b), including that its "average current assets over the preceding 3 years" be sufficient to cover "black lung benefits … which such operator may expect to be required to pay during the ensuing year," *id.* § 726.101(b)(3), and that it

"obtain security" in a form and amount approved by the Department, *id.* § 726.101(b)(4). Even then, the Department of Labor has discretion to deny an application for self-insurance. See *id.* § 726.101(a).

Upon approving an application for self-insurance, the Department sets the required amount of security at a level sufficient "to guarantee the payment of benefits and the discharge of all other obligations which may be required of such applicant under the Act." *Id.* § 726.104(a). That security can take many forms, including (1) "an indemnity bond with sureties satisfactory to the [Department]," (2) "a deposit of negotiable securities with a Federal Reserve Bank," (3) "a letter of credit issued by a financial institution satisfactory to the [Department]," and (4) a trust fund established "pursuant to section 501(c)(21) of the Internal Revenue Code." *Id.* § 726.104(b)(1)–(4).

The approval of a self-insurance application reflects no more than a determination by the Department that an operator has sufficient assets to cover expected black lung liabilities at the time of approval. This explains why self-insurers must receive renewed authorization at periodic intervals, as financial health is not static. See *id.* § 726.110(a). All along the Department wields substantial authority to examine an operator's books and records, see *id.* § 726.112(b), to adjust the required level of security to reflect the evolving financial health of the operator, see *id.* § 726.109, and to withdraw self-insurance authorization entirely if circumstances come to warrant, see *id.* § 726.115.

## II

With this statutory background in place, we turn to the dispute before us.

### A

Harold Grimes worked as a coal miner from 1965 to 1999 in both underground and surface mines. That work brought Grimes into regular contact with coal and rock dust as well as other gases and fumes. In retirement he developed emphysema and in 2016 was diagnosed with lung cancer. Believing that these conditions stemmed at least in part from his work in the mines, Grimes filed a claim for black lung benefits with the Department of Labor.

That filing set into motion the regulatory scheme we just described, beginning with the assigned district director examining Mr. Grimes's employment history to determine if any of his former employers satisfied § 725.494's requirements for potential liability. It found and notified just one—Apogee Coal Company. This was an interesting choice. Grimes, it is true, had worked for Apogee from 1972 until his retirement from the coal industry in 1999. But Apogee went bankrupt in 2015, alongside its parent company at the time, Patriot Coal Corporation. What is more, Apogee did not appear to resume operations following that bankruptcy.

In light of that history, the question before us comes into focus: how could § 725.494's fifth requirement be satisfied—that Apogee be "capable of assuming … liability for the payment of continuing benefits"—if the company was defunct. *Id.* § 725.494(e). This is where Apogee's parent company at the time of Grimes's retirement—Arch Resources Inc.—enters the mix.

In designating Apogee as a potentially liable operator, the district director, as it turns out, was simply following administrative protocol. Apogee was one of 50 Patriot Coal subsidiaries to go under in 2015. That wave of bankruptcies placed tremendous financial pressure on the Black Lung Disability Trust Fund. See U.S. Gov't Accountability Off., GAO-20-438T, Black Lung Benefits Program: Oversight Is Needed to Address Trust Fund Solvency Strained By Bankruptcies, p. 2 (2020) (estimating that Patriot Coal's bankruptcy resulted in the transfer of $230 million of benefits responsibility from mining companies to the Trust Fund). In response to this development, the Department of Labor issued an internal bulletin instructing its claims processing staff to notify bankrupt subsidiaries of potential liability in situations where the Department believed solvent third parties could be required to pay benefits on the subsidiaries' behalf. See Div. of Coal Mine Workers' Comp., Off. of Workers' Comp. Programs, Dep't of Labor, BLBA Bull. No. 16-01 (2015).

This was most obviously the case for miners who worked for one of Patriot's bankrupt subsidiaries at a time when the subsidiary was covered by a commercial black lung insurance policy. That is because 20 C.F.R. § 726.203(a) requires all such policies to include an endorsement making the insurer liable for any black lung claim that accrues against its insured during the policy period, regardless of when the benefits claim is ultimately filed. See *Director, Off. of Workers' Compensation Programs v. Trace Fork Coal Co.*, 67 F.3d 503, 505 n.4 (4th Cir. 1995). What this means is that commercial insurers remain contractually obligated to pay black lung benefits on their insured's behalf, even when the insured has ceased operating. By extension it also means that bankrupt operators remain "capable of assuming liability for the payment" of insured claims under

§ 725.494(e), so long as the insurance company itself is solvent.

Here, however, Apogee was not covered by a commercial insurance policy during Mr. Grimes's employment. It instead obtained self-insurance authorization through its then-parent corporation, Arch Resources. On these factual points, everyone agrees.

So far as we can tell, the Act's regulations do not expressly contemplate such a parent-subsidiary self-insurance arrangement, which the parties refer to as a self-insurance umbrella. Nevertheless, it is apparently a common practice. From what we have been able to gather, this approach allows a subsidiary like Apogee to self-insure on the strength of its parent's financial health. If a subsidiary covered by the parent's financial umbrella is unable to pay a black lung claim, the Department can call on the parent to do so. In this way, parent corporations effectively guarantee their subsidiaries' black lung obligations.

The record before us does not reveal whether the terms of this parent-subsidiary self-insurance arrangement are memorialized in a written contract akin to black lung insurance policies. Although self-insurers are required, as a "condition precedent" to receiving self-insurance authorization, to "execute and file with the [Department] an agreement and undertaking" committing to pay black lung claims "as required by the Act," no such agreement is in the record. *Id.* § 726.110(a), (a)(1). Neither party did much in their briefs to explain with much clarity how these parent-subsidiary arrangements work and get recorded at a nuts-and-bolts level.

What we do know, though, is that Bulletin 16-01 instructs claims processing staff to treat parent-subsidiary self-insurance arrangements similarly to commercial insurance policies. At a practical level this translates into a bankrupt Patriot Coal subsidiary (like Apogee) being named as a potentially liable operator so long as the claimant (like Harold Grimes) worked for the entity at a time when it was covered by a solvent parent corporation's self-insurance umbrella. In that circumstance, the Department appeared to believe that a parent corporation (akin to a commercial insurer) could be made under the Act to pay all claims that accrued against the subsidiary during the period of self-insurance, regardless of when the claim for benefits was filed. If this is correct, then in this circumstance, too, a bankrupt subsidiary would be "capable of assuming [] liability for the payment" of benefits through a solvent third party. *Id.* § 725.494(e).

Consistent with these instructions from Bulletin 16-01, the district director identified Apogee as a potentially liable operator on Mr. Grimes's claim and notified Arch of its potential for liability as Apogee's "Insurance Carrier."

Mr. Grimes's death came before the district director could issue its preliminary decision and order. This resulted in the substitution of Mrs. Grimes as a party, and the case proceeded. From the beginning, Arch objected to the district director's decision to notify Apogee as a potentially liable operator, seeing the notice as an indirect assertion of liability against it. Believing that no legal authority supported the Department's theory of liability, Arch insisted that the benefits obligation must fall to the Trust Fund.

The district director was not persuaded and in April 2019 issued a preliminary decision and order finding Mrs. Grimes

eligible for black lung survivor's benefits and designating Apogee as the responsible operator under 20 C.F.R. § 725.495. Although the district director's decision did not explicitly address Arch's objections to liability, implicit in its designation of Apogee was the conclusion that the core logic underpinning Bulletin 16-01 was correct—that although Apogee had gone bankrupt, Arch remained solvent and could be compelled to pay any black lung claims that accrued against Apogee while it was covered by Arch's self-insurance umbrella.

B

At Arch's request, the district director referred Mrs. Grimes's claim to a Department of Labor ALJ for further adjudication. After extensive proceedings, the ALJ came to agree with the district director's central conclusions—both that Mrs. Grimes was eligible for benefits (as Mr. Grimes's surviving spouse) and that, despite its bankruptcy, Apogee could be designated as the responsible operator because Arch bore legal responsibility for Mrs. Grimes's benefits under the Act and its implementing regulations.

The reasoning the ALJ gave for the latter of these two conclusions is difficult to parse. Where the ALJ began is easy enough to follow—with the recognition that Apogee could be designated as the responsible operator for Mrs. Grimes's benefits only if it satisfied the regulatory criteria enumerated by 20 C.F.R. § 725.494. In conducting that inquiry, however, the ALJ at times seemed to treat Arch as though it too were designated by the district director as a responsible operator. For example, the ALJ faulted Arch for failing to "prove that it is financially unable to pay benefits" under 20 C.F.R. § 725.495(b), a provision that by its terms applies only to the designated responsible operator. And in closing, the ALJ

remarked that "Apogee/Arch meets the regulatory criteria of responsible operator."

Arch seized upon this apparent conflation of Arch and Apogee in a motion for reconsideration. Pointing out that the district director had made it a party to Mrs. Grimes's black lung claim only in its capacity as a potentially liable self-insurer, Arch insisted that the ALJ had erred by treating it as a designated responsible operator under the Act's regulations.

The ALJ disagreed. In a supplemental opinion, the ALJ clarified that he was well aware that the district director "named Apogee, not Arch, as a potentially liable operator" and from there stood by his prior ruling that the district director had authority to do so under 20 C.F.R. § 725.494. Because everyone agreed that Apogee met § 725.494's first four requirements, the ALJ explained that "the only way for [Arch] to escape liability was to establish that Apogee [did] not possess sufficient assets to pay benefits." Arch failed to make that necessary showing, with the ALJ reasoning this way: Although Apogee was "no longer in … operation," Arch could be made to pay "under the regulations" because "it provided Apogee's self-insurance while the Miner was employed by Apogee." And there was no dispute that Arch had the financial ability to do so.

C

The Benefits Review Board affirmed. Rather than address the ALJ's reasoning, the Board rejected Arch's challenge to liability in a single paragraph that incorporated by reference its reasoning in three prior cases: *Bailey v. E. Assoc. Coal Co.*, BRB No. 20-0094 (Oct. 25, 2022) (en banc), *Graham v. E. Assoc. Coal*

*Co.*, 25 BLR 1-298 (2022), and *Howard v. Apogee Coal Co.*, 25 BLR 1-301 (2022).

Arch then sought our review.

**III**

Arch lodges several objections to the administrative pro-ceedings below. We address just one—its contention that the Department's theory of continuing liability for self-insuring parent corporations is without legal foundation.

A

But before we reach the merits, we owe a word on the standard of review. Although black lung appeals come to us from decisions of the Benefits Review Board, we have often observed that our principal focus is on the reasoning of the ALJ. See, *e.g.*, *Collins v. Old Ben Coal Co.*, 861 F.2d 481, 486 (7th Cir. 1988); *Zeigler Coal Co. v. Director, Off. of Workers' Compen-sation Programs*, 326 F.3d 894, 897 (7th Cir. 2003) (collecting cases). In most cases, this makes good sense. Because the Board's authority is strictly appellate, see 20 C.F.R. § 802.301, it must affirm an ALJ's decision that is "rational, supported by substantial evidence, and in accordance with applicable law." See *Consol. Coal Co. v. Director, Off. of Workers' Compen-sation Programs*, 911 F.3d 824, 838 (7th Cir. 2018). Most often our role is to ensure that the Board adheres to that mandate— that it affirms decisions of the ALJ that satisfy that standard and reverses those that do not. See *Crowe ex rel. Crowe v. Zei-gler Coal Co.*, 646 F.3d 435, 440–41 (7th Cir. 2011). So our focus necessarily concentrates in the main on the ALJ's reasoning, not the Board's.

This case comes to us with a slight wrinkle, however. Ra-ther than review the ALJ's analysis on its own terms, the

Board invoked, without elaboration, three of its own prece-
dents that it believed foreclosed Arch's position. We see no
problem in the Board's doing so. Whatever limitations 20
C.F.R. § 802.301 might place on the authority of the Board to
affirm an ALJ ruling on alternative grounds—a question we
do not consider or decide—we have no doubt that the Board
can apply its own decisions to the cases that come before it,
even when those decisions went overlooked by the ALJ.

But when we roll up our own sleeves and look to the de-
cisions relied on by the Board, we immediately see that they
do not overlap completely with the reasoning given by the
ALJ below. We therefore find ourselves confronted with *two*
distinct rationales for the agency action under review. In these
circumstances, we cannot limit our focus to the ALJ's reason-
ing alone. We instead must affirm so long as *either* rationale is
sound. So we proceed by examining with equal rigor the
analysis of both the ALJ and Board.

B

For all this case's regulatory complexity, the question pre-
sented distills to a single point of law: did either the ALJ or
the Board identify a valid legal basis for holding Arch liable
for the black lung liability owed by Apogee to Harold
Grimes's surviving spouse?

That basis could be statutory, regulatory, contractual, or
even equitable. But a basis there must be. There must be some
source of law (or perhaps combination of sources) that the De-
partment can point to that affirmatively requires Arch to sat-
isfy benefits owed to Mrs. Grimes. Without such a legal basis,
we see no alternative other than to reach the twofold conclu-
sion that the district director improperly designated Apogee

the responsible operator *and* that the Trust Fund must bear the cost of Mrs. Grimes's benefits. The latter conclusion follows because, remember, Apogee, by everyone's account, has no other conceivable source of assets that it could call on to cover its benefits obligation to Mrs. Grimes. To put the point in regulatory terms, if Arch is not legally obligated to pay on Apogee's behalf, Apogee is not "capable of assuming [] liability" for Mrs. Grimes's benefits under 20 C.F.R. § 725.494(e) and could not be designated as the responsible operator under § 725.495(a)(1).

We also cannot overstate the importance of a principle that limits our review. That principle comes from the Supreme Court's 1943 decision in *SEC v. Chenery* and instructs that agency action must be judged on the reasoning given by the agency at the time of its decision. See 318 U.S. 80, 87–88. Indeed, both parties were quick at oral argument to agree with this precise observation and, even more specifically, that the *Chenery* doctrine applies with full force in black lung appeals. See *Island Creek Coal Co. v. Henline*, 456 F.3d 421, 426 (4th Cir. 2006); *Pate v. Director, Off. of Workers' Compensation Programs*, 834 F.2d 675, 676 (7th Cir. 1987); but see *Arch of Kent., Inc. v. Director, Off. of Workers' Compensation Programs*, 556 F.3d 472, 477 (6th Cir. 2009) (concluding that *Chenery* does not apply to review of black lung benefits determinations).

In no way is our observation academic. The *Chenery* doctrine has the very practical effect of directing our focus singularly on whether the rationales given by the ALJ and the Board for holding Arch liable were legally sound.

Right off the bat, then, we can eliminate some possibilities. As Arch correctly observes, neither the ALJ nor the Board purported to hold Arch liable under common law principles

of equity. See, *e.g.*, *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 753 (7th Cir. 1989) (applying veil-piercing principles to determine whether parent could be held liable for labor law violations of subsidiary). Nor did the ALJ or the Board ground Arch's liability in an oral or written contract or in one or more than one provision of the Black Lung Benefits Act itself. Instead, both decisionmakers relied exclusively on the Act's implementing regulations.

But the ALJ and Board invoked the Act's regulations in only the most general and conclusory manner. We have thoroughly reviewed the decision of the ALJ and not one of the regulations it discussed or cited can be fairly read (in isolation or combination) to support the premise at the core of its liability determination: that self-insuring parent corporations—akin to commercial insurers—are legally obligated to pay all black lung benefits that accrue against their subsidiaries during the period of self-insurance, regardless of when the claim is filed.

The Board's reliance on its own precedent fell short for much the same reason. Of the three cases it identified and relied upon—*Bailey*, *Graham*, and *Howard*—only *Howard* squarely confronted the legal question before the ALJ here. The *Howard* case also involved Arch and Apogee. There, as here, the Department of Labor sought to use Arch's self-insurance umbrella as a means of shifting liability away from the Trust Fund. And there, too, Arch was adamant that the regulations did not support this result. It emphasized that the Department had achieved a similar result in the commercial insurance context only through the promulgation of 20 C.F.R. § 726.203(a), and stressed that "no similar provision" exists for self-insurance.

The Board in *Howard* was unpersuaded by Arch's insistence that its liability had to find some basis in positive law. To be sure, the Board did seem to agree with Arch that neither the Act nor its implementing regulations explicitly made a self-insuring parent liable for claims that accrued against a former subsidiary like Apogee. But from there the Board saw that legal gap as supporting the Department of Labor, not the other way around. Arch, it reasoned, had failed to point to any "regulatory authority to support [its] argument that self-insurance liability is triggered by the date the claim is filed rather than the last day of the miner's coal mine employment." Regulatory silence, in other words, supported liability, not assignment of the claim to the Trust Fund.

The Director attempts to defend the essence of *Howard*'s reasoning on appeal. Conceding that there is no "explicit regulation" supporting the Department's proposed rule, the Director contends that such a regulation is unnecessary because the liability of parent corporations like Arch is inherent in the very fiber of self-insurance. We find this assertion unpersuasive, for the position anchors itself more in policy reasoning than an identifiable source of law. Liability may not be imposed on a corporation simply because it strikes an agency or a court as sensible as a matter of policy. The rule of law requires that the rights, duties, and obligations of persons and corporations alike spring, if at all, from some concrete basis in positive law or principle of equity. Unless and until the Department identifies such a basis for the theory of liability it embraced in this case, we are unwilling to read into regulatory silence an intention to depart from the time-honored principle "that a parent corporation … is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted); see also *Olympia*

*Equipment Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 798 (7th Cir. 1986).

The Director presses several other contentions to save the ALJ's and Board's decisions. Foremost, the Director criticizes as "irrational" a rule that would treat the primary liability of operators like Apogee—which endures as long as they remain "capable of assuming [] liability for the payment of continuing benefits" under 20 C.F.R. § 725.494(e)—differently from that of a self-insuring parent corporation. He claims, moreover, to find support for the Department's position in a D.C. Circuit decision interpreting indemnity bonds posted as security for self-insurance. See *United States v. Ins. Co. of N. Am.*, 83 F.3d 1507 (D.C. Cir. 1996). Finally, he warns of the potentially serious policy consequences that might ensue if Arch's position prevails. Whatever their merit, not one of these arguments was mentioned (directly or even obliquely) by the ALJ or the Board below. *Chenery* precludes us from considering them for the first time on appeal.

We have read the ALJ's and Board's decisions many times over, and in the end remain unable to identify a statutory or regulatory provision—identified by the ALJ or Board—that supports holding Arch liable for the benefits obligation owed by Apogee to Harold Grimes's surviving spouse. *Chenery* requires that we approach our review this exact way, and in the final analysis we see no way around concluding that the decisions of the ALJ and Board lack legal support. We therefore have no choice but to vacate the decision of the Benefits Review Board.

In reaching this conclusion, we find ourselves at odds with the Sixth Circuit's recent decision in *Apogee Coal Company, LLC v. Director, Off. of Workers' Compensation Programs*, No. 23-

3332, — F.4th —, (Aug. 5, 2024), which affirmed the Board's bottom-line conclusion in *Howard* that Arch could be held liable as a self-insuring parent for black lung benefits owed by Apogee, its former subsidiary. It did so based on two regulations: 20 C.F.R. §§ 726.110(a)(1) and 726.4(b). The first mandates that all self-insurers "execute and file … an agreement and undertaking" in which they agree to pay black lung benefits "when due, as required by the Act." *Id.* § 726.110(a)(1). The second emphasizes "that the Secretary [of Labor] has wide latitude for determining which operator shall be liable for the payment of Part C benefits" and states that any "business entity which has had or will have a substantial and reasonably direct interest in the operation of a coal mine may be determined liable for the payment of pneumoconiosis benefits" under the Act.

After careful consideration, we see nothing in the Sixth Circuit's analysis that warrants a different outcome in this case. Although §§ 726.110(a)(1) and 726.4(b) found passing mention in the decisions of the ALJ and the Board below, neither decisionmaker intimated, let alone held, that Arch's liability as a third-party self-insurer sprung from those regulations. *Chenery* thus precludes us from affirming the Board on the Sixth Circuit's theory.

Even if we could overlook *Chenery*, it is hard to see how either provision could support a finding of liability on the facts before us. Section 726.110(a)(1) mandates only that self-insurers agree to pay black lung benefits "*as required by the Act*." (emphasis added). By its very terms, § 726.110(a)(1) is not an independent source of liability—a self-insurer's promise to pay benefits kicks in only if a provision elsewhere in the Act makes it liable on a claim. As for § 726.4(b), that

regulation appears to do no more than give the Secretary of Labor flexibility in determining which entities can be designated as the responsible operator. But remember that the district director designated Apogee—not Arch—as the responsible operator for Mrs. Grimes's benefits. That the district director *might* have been able to designate Arch as the responsible operator in this case (a question we take no position on) is beside the point, because that is not the decision that was actually made by the agency.

Because this opinion could be seen as creating a conflict with the Sixth Circuit, the panel circulated it before release to all judges in active service under Circuit Rule 40(e). No judge voted to hear the appeal en banc.

All that remains is to determine the scope of remand. Whatever authority we might possess to remand for a fresh attempt by the agency to justify its liability determination, we decline to do so in the circumstances of this case. The Director has not requested a remand, and the Act's implementing regulations disfavor turning the liability question into a game of administrative ping pong. It is precisely to prevent such delay in the adjudication of benefits that the Department decided to require the Trust Fund to pay benefits in cases where the district director designated the wrong responsible operator. 65 Fed. Reg. 79990 (Dec. 20, 2000) (noting that "[t]his limitation … prevents a claimant from having to relitigate his entitlement to benefits"). So although we return the case to the Department, we do so for the limited and exclusive purpose of allowing the Department to take those measures necessary to assign Mrs. Grimes's benefits to the Black Lung Disability Trust Fund.

**IV**

We close by emphasizing the limited scope of today's holding. That the Department of Labor has yet to articulate a basis for liability in cases like this one does not mean that no such basis exists. For today, all we decide is that the ALJ and the Board have failed to justify their conclusions that Arch can be compelled to satisfy the black lung liability of Apogee. The *Chenery* doctrine, to say nothing of the party presentation principle, affirmatively prohibits us from scouring the Act and regulations for bases for liability that have to date gone unidentified by the Department. In future black lung cases, the Director can press additional arguments for the rule it advocates. And with the benefit of those proceedings, courts will come closer to a final answer about what the regulations do and do not authorize. In the specific case of Mrs. Grimes, however, the Trust Fund, not Arch, must pay.

The petition for review is GRANTED and the case REMANDED to the Board with instructions that Mrs. Grimes's benefits be assigned to the Black Lung Disability Trust Fund.